In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1333

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JENNIFER LYNN KRIEGER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 CR 40001 JPG 1— **J. Phil Gilbert,** *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED DECEMBER 7, 2010

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* The afternoon before Thanksgiving, 2005, Jennifer Curry's mother found her nineteen-year-old daughter dead on a sofa at the home of Curry's father. At the scene, investigators found, among other things, a chewed 100 microgram Duragesic patch. Duragesic is a brand name for a fentanyl skin patch, a powerful opioid that is delivered across the skin in small steady doses over the course of several days. It is not meant to be ingested orally nor injected

under the skin, but sometimes is by those who are abusing the drug. Of course, fentanyl is available only by prescription and, not surprisingly, Jennifer Curry did not have one. Her friend, Jennifer Krieger, however, had such a prescription and despite her pain from severe spinal cord and disk problems, she began selling the patches to others for $50 apiece or, as happened here, giving them to her friends. On November 22, 2005, Krieger filled her prescription for the patches and later that afternoon gave one to Curry. The two women then proceeded, with some other friends, to several bars. Krieger left Curry at around midnight and another witness saw Curry leave a bar with two men in the early hours of November 23. Curry arrived at her father's home at approximately two o'clock in the morning. Her mother found her unresponsive at approximately four o'clock the next afternoon and began performing CPR. When the paramedics arrived, they determined that Curry had been dead for some time. At the scene, the investigators found a hypodermic needle, a small pipe with burnt residue on it, and two red capsules that were not taken into evidence and tested. A medical examiner found traces of many drugs in Curry's system, including cocaine, benzodiazepines, cannabinoids, and Oxycodone, but concluded that Curry died from fentanyl toxicity.

The federal grand jury returned a two-count indictment on January 5, 2006, charging Krieger with distribution of divers amounts of fentanyl with death resulting, under 21 U.S.C. § 841(a)(1) and § 841(b)(1)(c). Krieger concedes that she gave Curry a patch. She denies, however, that the government proved sufficiently that

Curry's death resulted from her abuse of the fentanyl patch. Krieger objects both to the manner in which the government proved that "death resulted" (as a sentencing factor proved by a preponderance of the evidence rather than an element proved beyond a reasonable doubt) and the sufficiency of the evidence. In particular, Krieger argues that the government failed to link sufficiently Curry's death to the fentanyl.

Krieger's claim of insufficiency is based, in part, on a critical weakness in the government's case. In a strange twist of events, the government's main witness, the medical examiner, Dr. John Heidingsfelder, fled the country under a cloud of suspicion. It seems that Heidingsfelder had legal problems of his own, including tax and ethics trouble, and had left the country and set up a practice in the Cayman Islands. Investigators for the U.S. Attorney's office had been unable to track him down. Heidingsfelder also had been disciplined by the Indiana Medical Licensing Board for engaging in a prohibited personal relationship with a patient, for prescribing medication to his girlfriend/ patient, and failing to keep abreast of current professional theory and practice. Apparently, Heidingsfelder had engaged in sexual contact with a patient under his care and provided her hydrocodone and other narcotic drugs. The woman committed suicide after Heidingsfelder terminated the relationship.

With the main witness unavailable, the government informed the court that it was engaged in good faith plea negotiations. When those negotiations failed, the

government returned a one-count superseding indict-ment in which the "with death resulting" language of the indictment had been eliminated. In this superseding indictment, Krieger was charged only with distribution of divers amounts of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The following day, Krieger filed a motion to dismiss the indictment arguing that the unavailability of the doctor who performed the autopsy presented an incurable confrontation clause and chain-of-custody problem. The district court denied the motion but left open the possibility that it would revisit the issue at a later time.

On October 18, 2008, Krieger pleaded guilty to the superseding indictment with the specific exclusion that she was not pleading guilty to causing the death of Curry. The following exchange occurred between Krieger and the court:

> THE COURT: Ms. Krieger, without admitting that the patch that you sold or gave to Jennifer Curry resulted in her death, the question is: Is the factual basis that you, on November 23rd, 2005, did knowingly and intentionally distribute diverse [sic] amounts of fentanyl correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay. At this time I'm going to ask you how you plead to the charge in the superseding indictment that on November 23rd, 2005, you did knowingly and intentionally distribute diverse [sic] amounts of fentanyl, a Schedule II controlled

substance, in violation of federal law, guilty or not guilty?

THE DEFENDANT: I am guilty.

(R. at 14-1 pp.12-13).

Krieger's pre-sentencing report set forth a recommended sentencing range of ten to sixteen months. The government filed objections, arguing that the court should find that Curry's death resulted from Krieger's distribution of fentanyl, thus triggering a mandatory minimum sentence of twenty years under 21 U.S.C. § 841(b)(1)(C). That statute instructs, "[I]f death or serious bodily injury results from the use of such substance [such person] shall be sentenced to a term of imprisonment of not less than twenty years or more than life." *Id.* In the alternative, the government suggested an upward departure under either United States Sentencing Guideline § 5K2.1 (allowing upward departure where death has resulted) or § 5K2.21 (allowing upward departure to reflect seriousness of the offense based on dismissed charges). In response, Krieger argued in her sentencing memorandum that the court should consider, under 18 U.S.C. § 3553(a), mitigating factors including her difficult upbringing, the fact that she had been a victim of rape and physical violence, her significant medical and psychological problems, her substance abuse, and her responsibilities as a single mother.

The court held a sentencing hearing on October 18 and 19, 2009, to determine whether the fentanyl had resulted in the death of the victim. During that hearing, the government called numerous witnesses, including the previously unavailable but subsequently found

Heidingsfelder. Krieger called Dr. Long, a forensic toxicologist who testified regarding problems with evidence collection and who challenged the determination of the cause of death. We will fill in the remaining details of the evidence as necessary below.

On January 16, 2009, the district court issued its order, finding, by a preponderance of the evidence, that the fentanyl supplied by Krieger resulted in the death of Curry. The court found Heidingsfelder's testimony regarding his reasons for leaving the country not credible, but found his testimony regarding how he conducted the autopsy and how he arrived at his conclusions as to the cause of Curry's death to be credible. In view of the conflicting evidence as to the cause of Curry's death, the court concluded that the government would not have been able to prove, beyond a reasonable doubt, that Krieger's distribution of fentanyl was the cause of Curry's death, had Krieger been charged with that offense. The court was persuaded, however, that a preponderance of the evidence established fentanyl as the cause of Curry's death, and concluded that "the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in Ms. Curry's death." (R. at 154, p.8).

Once the court made the finding, by a preponderance of the evidence, that death resulted, it concluded that it was obligated to impose the mandatory statutory minimum under § 841(b)(1)(C) "if death results"—twenty years. As it turns out, twenty years was the one and only sentence the court could impose.

To understand this sentence, we must skip ahead of ourselves for a moment with a promise to circle back for a fuller explanation of the law. Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the court could not impose a sentence greater than the twenty-year statutory limit for distribution of the drug—the crime to which Krieger pleaded guilty. But because the court found that Curry's death resulted from the distribution of fentanyl (by a preponderance of the evidence, but again, more on this later), the court had no choice but to impose the mandatory minimum sentence triggered by that fact—in this case, twenty years. In short, in this case the mandatory minimum triggered by facts found by the court based on a preponderance of the evidence in sentencing converged with the statutory maximum imposed for facts to which Krieger pleaded guilty as an element of the crime. The result was that the court could impose exactly one sentence—twenty years. The judge had no discretion whatsoever in the choice of sentence.

The district court was uncomfortable, it seems, with the fact that "Krieger, while convicted of distribution of divers amounts of narcotics, is being sentenced for homicide." (R. at 154, p.10). The court went on at some length criticizing the sentencing scheme, which allowed it absolutely no discretion in sentencing. In its written decision, the court declared that "had the Court the discretion to insist that the Government prove beyond a reasonable doubt that the distribution to which Krieger pleaded guilty resulted in Curry's death

before imposing the statutory minimum sentence, it would have exercised that discretion in this case." *Id.* at p.10. The court made it clear that it was sentencing Krieger to twenty years as it felt that it had no choice, and specifically noted that it otherwise would have been inclined to impose a sentence within the range of 168 to 210 months (14-17.5 years).[1] *Id.* at pp.10, 13.

At sentencing, the court stated:

> This has probably been one of the most difficult cases I've had to rule upon in the over 16 years I've been a federal judge and four years prior to that. Probably over the 20 years I've been a judge, this is one of the most difficult decisions I've had to make, and it's a decision that I do not agree with, but it's a decision that, when I take an oath, I have to uphold the law. I struggled with the evidence here and the credibility issues, and I'm struggling with the law here. But my job is to apply the law. I don't make it. And there have been times I've had to make decisions that I personally do not agree with.

---

[1] Although the pre-sentence report had suggested a sentencing range of ten to sixteen months, the court determined that it could have and would have applied the adjusted base offense level called for in U.S.S.G. § 2D1.1(a)(2), finding that the government had established the "death resulting" factor by a preponderance of the evidence. (R. 154, p.13) After reducing for acceptance of responsibility, the district court came to a total offense level of thirty-five and a sentencing range of 168-210 months' incarceration. *Id.*

> I agree that you need to go to jail for a long time, but as I said in my opinion, 20 years is too harsh.

(R. at 14-10, p.24).

Following sentencing, Krieger filed a timely notice of appeal to this court.

**II.**

**A.**

Krieger maintains that the fact that a death resulted from the distribution of fentanyl is an element of the offense. If the fact of a resulting death is deemed an element of the offense, then it must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.[2] *Harris v. United States*, 536 U.S. 545, 549-50 (2000). The district court, we have noted, did not believe that the government could have met that burden here. (R. at 154, pp.8, 10). The government maintains that because the finding did not raise the statutory maximum term, it is appropriately characterized as a sentencing factor. Sentencing factors need not be charged nor proved beyond a reasonable doubt, but may instead be found by the court at sentencing by a preponderance of the

---

[2] In this case we repeatedly use the expression "proved to the jury," as did the Supreme Court in *Apprendi*. More accurately, one might describe facts that must be proved to a jury, if the defendant has chosen to be tried by a jury, or to the judge as finder of fact, if the defendant has so chosen. For efficiency, however, we will continue to refer to facts that must be proved to a jury.

evidence. *Harris*, 536 U.S. at 549-50. We review these issues of law regarding *Apprendi* and burdens of proof de novo. *United States v. Clark*, 538 F.3d 803, 811 (7th Cir. 2008).

The outcome in this case highlights the critical nature of the distinction between sentencing factors and elements. In this case, without death resulting, the maximum penalty for distributing small amounts of fentanyl would have been twenty years, with no minimum penalty. 21 U.S.C. § 841 (b)(1)(C) ("In the case of a controlled substance in schedule I or II . . . such person shall be sentenced to a term of imprisonment of not more than 20 years."). In cases where death results from the distribution, the sentence increases to a minimum of twenty years and a maximum of life in prison. *Id.* Once a court makes a finding that triggers a mandatory minimum sentence, it has no choice but to impose that sentence. *See United States v. Roberson*, 474 F.3d 432, 434-35 (7th Cir. 2007) (district court judges may not ignore statutory sentencing ranges).

To resolve the dispute between Krieger and the government, we must turn to the basics on sentencing and burdens of proof. In the watershed case of *Apprendi*, the Supreme Court held that the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment mandate that "[o]ther than the fact of a prior conviction, any fact that increases the penalty of a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Stated more colloquially (and for simplicity sake,

ignoring the fact of a prior conviction, as no such facts are at issue here), Congress determines a sentencing range by statute, and any fact that increases the sentence beyond that range must be presented to a jury and proved beyond a reasonable doubt. Any fact that does not increase the sentence beyond the range can be proved by a preponderance of the evidence by the court alone.

But what of factors that increase the *minimum* penalty for a crime—for example, factors that increase a defendant's possible sentence from 0-20 years to 10-20 years' incarceration? According to Supreme Court precedent, the constitutional considerations articulated in *Apprendi* do not apply to increases in minimum penalties. *Harris v. United States,* 536 U.S. 545, 557 (2002). Consequently, a statute can increase a minimum penalty when a fact is found by a judge using a preponderance of the evidence standard. *McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986). The reason, according to that Court, is that a statute that sets a mandatory minimum "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it." *Id.* at 87-88. In this way, these provisions "up the ante" for a defendant only by raising the minimum sentence within the statutory plan. *Id.* at 88.

To recap, *Apprendi*, in this case, set the maximum sentence at twenty years, for the facts to which Krieger pleaded. The "death resulting" finding set the mini-

mum sentence at twenty years. Thus, the mandatory minimum converged with the statutory maximum and the district court could impose but one sentence—twenty years.

Both in dissent in *Apprendi* and in cases that followed, some Supreme Court justices concluded that the holding in *McMillan* could not survive the reasoning in *Apprendi*. Justice Stevens, for example, recently stated, "[n]ot only was *McMillan* wrong the day it was decided, but its reasoning has been substantially undermined—if not eviscerated—by the development of our Sixth Amendment jurisprudence in more recent years." *United States v. O'Brien*, 130 S. Ct. 2169, 2182 (2010) (Stevens, J., concurring); *See also Apprendi*, 530 U.S. at 518 (Thomas, J., dissenting) ("The consequence of the above discussion for our decisions in *Almendarez-Torres* and *McMillan* should be plain enough."); *Harris*, 536 U.S. at 572 (Thomas, J., dissenting) (noting that *McMillan*, conflicts with the Court's later decision in *Apprendi* and should be overruled). After all, in *Apprendi*, the majority explicitly endorsed the conclusion reached by Justice Stevens in an earlier case that: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (citing *Jones v. United States*, 526 U.S. 227, 252-53 (1999)) (Stevens, J., concurring)). Increasing a minimum sentence certainly would seem to increase the range of penalties to which a defendant is exposed.

Despite these doubts, in *Harris*, the Supreme Court (over considerable dissension, as we will discuss below) held that *McMillan* survived. *Harris*, 536 U.S. at 568. Under the *Harris* plurality's reasoning, once a trial jury has found all the facts necessary to establish the maximum sentence beyond a reasonable doubt, the Fifth and Sixth Amendments have been satisfied, and the judge may impose any sentence within the statutory range based on facts not alleged in the indictment or proved to a jury. *Id.* at 565. That Court went on to explain that such a finding does not expose a defendant to a punishment greater than that otherwise legally prescribed, and those facts not alleged in the indictment nor proved to a jury beyond a reasonable doubt may trigger a mandatory minimum higher than the sentence the judge may otherwise have imposed. *Id.* at 566.

The *Harris* Court thus confirmed that elements of an offense must be proved to the jury beyond a reasonable doubt, but relevant conduct used in sentencing may be determined by the court using the preponderance of the evidence standard. *Harris*, 536 U.S. at 549-50. But how does one determine whether a particular fact is an element or a sentencing factor? The Supreme Court tackled this question too in *Harris*, and reiterated its conclusions in its recent decision in *O'Brien*, 130 S. Ct. at 2169. In both *Harris* and *O'Brien*, the Court was called upon to consider whether a particular provision of 18 U.S.C. § 924(c)(1) should be characterized as a sentencing factor that could be determined by the court using a preponderance of the evidence standard or as an element of the crime that must be found by a jury

beyond a reasonable doubt. In *Harris*, 536 U.S. at 550-51, the provision at issue increased the penalty if the defendant brandished a weapon. 18 U.S.C. § 924(c)(1)(A)(ii) ("if the firearm is brandished, [the defendant will] be sentenced to a term of imprisonment of not less than 7 years."). The Court held that this was a sentencing factor to be found by the judge. *Harris*, 536 U.S. at 556. And in *O'Brien*, the provision at issue increased the penalty if the gun used by the defendant was characterized as a machine gun. 18 U.S.C. § 924(c)(1)(B)(ii) ("if the firearm possessed by a person convicted of a violation of this subsection . . . (ii) is a machinegun . . . the person shall be sentenced to a term of imprisonment of not less than 30 years.") *O'Brien*, 130 S. Ct. at 2175-76. The *O'Brien* Court determined that this provision was an offense element that must be found by a jury beyond a reasonable doubt. *O'Brien*, 130 S. Ct. at 2180. These cases provide the guideposts for our determination here.

According to the Supreme Court in *O'Brien*, the analysis must begin with any previous Supreme Court assessment of the matter (in this case, there is none). Then, the court must evaluate (1) the language and structure of the statute, (2) tradition, (3) the risk of unfairness, (4) the severity of the sentence, and (5) any legislative history. *O'Brien*, 130 S. Ct. at 2175.

In this case, the language of 21 U.S.C. § 841, at first blush, would seem to be the beginning and end of the element/sentencing factor inquiry. Section (a) of the statute is labeled "unlawful acts" and (greatly simplified) prohibits anyone from knowingly or intentionally

making or distributing drugs or their counterfeits. Section (b) is labeled "penalties" and sets forth the applicable sentences. In *Harris*, the Court noted that "we can presume that [a statute's] principal paragraph defines a single crime and its subsections identify sentencing factors." *Harris*, 536 U.S. at 553. This certainly seems to be the case here. Thus, the language of the statute would appear to leave no option but to hold that "death resulting" is a sentencing factor for the court to consider using the more relaxed burden. This jibes with our previous holdings in which "[w]e have repeatedly held that § 841's elements are contained in subsection (a); subsection (b) contains the considerations which determine the maximum and minimum sentence." *United States v. Martinez*, 301 F.3d 860, 865 (7th Cir. 2002); *see also United States v. Bjorkman*, 270 F.3d 482, 491-92 (7th Cir. 2001); *United States v. Brough*, 243 F.3d 1078, 1079 (7th Cir. 2001). But the cases cited for this proposition in this Circuit address only the question of whether the drug quantity provisions of § 841(b) are sentencing factors or elements and fail to address whether the same holds true for the "death resulting" language of § 841(b). Moreover, although we have said in shorthand that § 841(a) contains the elements and § 841(b) the sentencing factors, what we have really articulated is that drafting, ordering, and labeling do not matter, rather "*Apprendi* holds that the due process clauses of the fifth and fourteenth amendments make the jury the right decisionmaker (unless the defendant elects a bench trial), and the reasonable-doubt standard the proper burden, when a fact raises the maximum

lawful punishment." *Brough*, 243 F.3d at 1079. "It makes no constitutional difference whether a single sub-section covers both elements and penalties [or] whether these are divided across multiple subsections." *Id.*

Furthermore, the *Harris* Court has instructed that language and structure are not the only consideration. *Harris*, 536 U.S. at 553. And so, although the language seems fairly definitive, we must look at the remaining factors to see in which direction they point.

Tradition and past congressional practice, the *Harris* Court concluded, are important considerations. *Id.* Other federal statutes to include the "death resulting" or similar language are structured in a similar manner to 18 U.S.C. § 841. Those statutes generally begin with a paragraph that defines the crime and then contain a separate list of "penalties" or "punishments." *See, e.g.,* 18 U.S.C. § 43(b)(5) ("if the offense results in death of another individual" language is listed in "penalties" section); 18 U.S.C.A. § 1030 (c)(4)(F) ("if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection" language is included in "punishments" section); 18 U.S.C.A. § 1091(b)(1) ("where death results" language is included in "punishments" section). It would be odd indeed for Congress to habitually include "death resulting" types of increases in portions of statutes labeled "penalties" or "punishments" when in fact Congress intended for this factor to be included as an element. By including the "if death results" language in separate sections labeled "penalties" Congress seems to have intended for courts

to consider the fact that a death has resulted as a sentencing factor.

On the other hand, the *O'Brien* Court instructs that, "[s]entencing factors traditionally involve characteristics of the offender—such as recidivism, cooperation with law enforcement, or acceptance of responsibility. Characteristics of the offense itself are traditionally treated as elements." *O'Brien*, 130 S. Ct. at 2176. Causing the death of another person certainly does not resemble a characteristic of the offender. Often it is, in and of itself, the crime of murder or manslaughter. This consideration favors a finding of "element."

In this particular case, the third and fourth factors—considerations of fairness and the severity of the sentence—merge. When we consider these issues, the pendulum swings sharply in Krieger's favor. The fact that a death has resulted catapults a defendant's minimum sentence from zero to twenty years. In *Harris*, the Court found that incremental changes in a minimum sentence from five to seven to ten years are precisely the types of increases one would expect to see when Congress intended a judge to consider the conduct in sentencing. *Harris*, 536 U.S. at 554. In contrast, in *O'Brien* the Court was evaluating a factor that increased the mandatory minimum sentence from five to thirty years and noted that, "[t]his is not akin to the incremental changes in the minimum that one would expect to see in provisions meant to identify matters for the sentencing judge's consideration." *O'Brien*, 130 S. Ct. at 2177 (citing *Harris*, 536 U.S. at 554). Although it is true that Krieger

could have received twenty years even without the finding of death resulting, this seems unlikely. For one thing, the district court made clear that it found the twenty-year sentence to be unreasonably harsh in light of the facts of the case, and specifically stated that it would have sentenced Krieger to 168 to 210 months. (R. at 154, pp.10, 13). More compellingly, the average length of incarceration for defendants convicted under 21 U.S.C. § 841 for distribution of fentanyl where death has not resulted (and with a criminal history category of I—as was the case with Krieger) was seven months[3]. (Letter from Timothy Drisko, Research Data Co-ordinator, Office of Research and Data, U.S. Sentencing Comm'n to Deputy Circuit Librarian, Library of the United States, on file with the Library for the United States, 219 S. Dearborn, Chicago, IL.) The district court also commented on the unfairness of the sentencing regime, noting that although Krieger was convicted of distribution of divers amounts of fentanyl, it seemed obvious that she was being sentenced for homicide. (R. at 154, p.10).

Certainly there are factors from the *O'Brien* and *Harris* list that point us toward defining "death resulting" as an element of the crime, but this court is hard pressed to ignore the most important considerations: first, the clear command of the language listing "death resulting" in

---

[3] Average for fiscal year 2006-2009 and is based on cases sentenced under the federal sentencing guidelines involving any quantity of fentanyl and no other drugs.

the "penalties" section of the statute, and second, our precedent (at least when considering drug quantity) of defining the considerations in § 841(b) as sentencing factors (so long as they do not increase the sentence above the statutory maximum). This court, like the district court, must conclude that "death resulting" is a sentencing factor that need not be pleaded in the indictment and tried before a jury, but rather could be found by a judge using a preponderance of the evidence burden. Because this fact was not pleaded in the indictment, nor admitted by Krieger, the maximum offense Krieger could have received was twenty years. *See United States v. Duvall*, 272 F.3d 825, 830 (7th Cir. 2001) ("although the failure to establish these facts beyond a reasonable doubt limits the choice of maximum sentence under § 841, it does not jeopardize the conviction"); *Brough*, 243 F.3d at 1080 ("[A] post-*Apprendi* indictment should specify, and the trier of fact must be instructed to determine, not only the elements of the offense, which appear in § 841(a), but also the events listed in § 841(b) on which the prosecutor relies to establish the maximum sentence."). The district court was also correct that once it found, by a preponderance of the evidence, that death had resulted when Krieger distributed the fentanyl, the court was obliged to impose the mandatory minimum sentence of twenty years. *Roberson*, 474 F.3d at 436 ("[I]n making the sentencing guidelines advisory, the Court did not authorize courts to sentence below the minimums prescribed not by the guidelines but by constitutional federal statutes."); *United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006) ("*Booker* does not permit district judges to

disregard mandatory minimum sentences or change the treatment of recidivist offenders, all that *Booker* does is specify the appropriate decision maker (the jury) and the burden of persuasion (beyond a reasonable doubt) for facts that affect statutory maximum penalties.").

**B.**

Having followed the guidance of the Supreme Court in *McMillan, O'Brien*, and *Harris*, it is worth pausing for a moment to note the disagreement within the Supreme Court regarding this approach and the precipice upon which the *McMillan* holding stands. After all, what should we make of a judicial approach that determines that whether the fact that the firearm was a machine gun is an element to be proved to the jury beyond a reasonable doubt, (*O'Brien*), but whether the gun was brandished is relevant conduct that can be determined by a judge under the preponderance of the evidence standard (*Harris*). *See O'Brien*, 130 S. Ct. at 2183, n.5. (Stevens, J., concurring) ("[*Harris'*] reading of the mandatory minimum for 'brandishing' a firearm contained in 18 U.S.C. § 924(c)(1)(A) as a sentencing factor is not so easily distinguished from the nearly identical mandatory minimum for possessing a 'machinegun' under § 924(c)(1)(B)").

The thread by which *McMillan* hangs may be precariously thin. In fact, at the time the *Harris* case was decided, five Supreme Court justices—a majority— believed that the holding in *McMillan* was inconsistent with *Apprendi*. Four of those justices (Justices Stevens,

Souter, Thomas and Ginsburg) dissented in *Harris* on
the belief that

> when a fact exposes a defendant to greater punish-
> ment than what is otherwise legally prescribed, that
> fact is by definition an elemen[t] of a separate legal
> offense. Whether one raises the floor or raises the
> ceiling it is impossible to dispute that the defendant
> is exposed to greater punishment than is otherwise
> prescribed.

*Harris*, 536 U.S. at 579 (Thomas, J., dissenting) (internal
citations omitted). A fifth justice, Justice Breyer, wrote
separately in *Harris* to note that he could not "easily
distinguish *Apprendi* from this case in terms of logic," and
therefore could not "agree with the plurality's opinion
insofar as it finds such a distinction." *Harris*, 536 U.S. at
569 (Breyer, J., concurring). Justice Breyer, however,
concurred in the judgment because he maintained his
disagreement with the entire premise of *Apprendi* and
continued to "believe that the Sixth Amendment
permits judges to apply sentencing factors—whether
those factors lead to a sentence beyond the statutory
maximum (as in *Apprendi*) or the application of a manda-
tory minimum (as here)."[4] *Id.*

---

[4] As Justice Stevens noted in his dissent in *O'Brien*, Justice
Breyer's dedication to his position in *Harris* may be waning.
*O'Brien*, 130 S. Ct. at 2183, n.6. In oral argument in the *O'Brien*
case, Justice Breyer stated, "In *Harris*, I said that I thought
*Apprendi* does cover mandatory minimums, but I don't accept

(continued...)

Of course, the composition of the Court has now changed, but at one recent time a majority of the Court believed that the holding of *McMillan* was inconsistent with the holding in *Apprendi*. Four of those justices subscribe to a much simpler proposition: any fact that increases the prescribed range of penalties to which a defendant is exposed must be submitted to a jury and found beyond a reasonable doubt. *Harris*, 536 U.S. at 579 (Thomas, J., dissenting), *O'Brien*, 130 S. Ct. at 2182 (Stevens, J., concurring).

Under these Justices' understanding of the law, a court need not go through a lengthy analysis using the five factors set forth in *Harris* or *O'Brien* or any other machinations to determine whether a particular factor constitutes an element of a crime or a sentencing factor. If a fact becomes the basis for imposing or increasing the punishment (or establishing or increasing the prosecution's entitlement), it must be contained in the indictment and proved to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 521 (Thomas, J., dissenting). It matters not whether it is labeled a sentencing factor or an element or whether it triggers punishment in excess of the

---

(...continued)

*Apprendi*. Well, at some point I guess I have to accept *Apprendi*, because it's the law and has been for some time. So if . . . if that should become an issue about whether mandatory minimums are treated like the maximums for *Apprendi* purposes, should we reset the case for argument?" Transcript of Oral Argument at 20, *O'Brien*, 130 S. Ct. 2169 (2010) (No. 08-1569) (question by Breyer, J.).

statutory maximum or triggers a statutory minimum. *O'Brien*, 130 S. Ct. at 2181-82 (Stevens, J., concurring), *id*. at 2184 (Thomas, J., concurring). In this case, the "death resulting" fact unequivocally mandated the imposition of a sentence more severe than the judge would have had discretion to impose, and thus under this simplified rule it should have been considered an element of the crime. Indeed, by virtue of the intersection between the statutory maximum and minimum terms, it eliminated the court's discretion altogether leaving the court with no choices but to impose a sentence of twenty years.

This circuit has also spoken of looking at effects when evaluating the element/sentencing factor dilemma. Speaking of 18 U.S.C. § 841(b) (and following the still intact holding of *McMillan* as an appellate court must), our court explained:

> [T]he statute does not say who makes the findings or which party bears what burden of persuasion. Instead the law attaches effects to facts, leaving it to the judiciary to sort out who determines the facts, under what burden. It makes no constitutional difference whether a single subsection covers both elements and penalties, whether these are divided across multiple subsections (as § 841 does), or even whether they are scattered across multiple statutes (see 18 U.S.C.§§ 924(a), 1963). *Apprendi* holds that the due process clauses of the fifth and fourteenth amendments make the jury the right decisionmaker (unless the defendant elects a bench trial), and the

reasonable-doubt standard the proper burden, when a fact raises the maximum lawful punishment. How statutes are drafted, or implemented, to fulfill that requirement is a subject to which the Constitution does not speak.

*Brough*, 243 F.3d at 1079.

Logically, there is no reason why this simple binary rule should not also apply to mandatory minimums. Whether labeled an element or a sentencing factor, if a fact triggers a mandatory minimum, the expected punishment will have increased and the government can require the judge to impose a higher punishment than she might have chosen otherwise. *See Apprendi*, 530 U.S. at 521-22 (Thomas, J., dissenting).

In this respect, it is difficult to reconcile *McMillan* with *Apprendi*. *McMillan*, however, has not been overruled. And unless and until the Supreme Court explicitly overrules a case, we are bound by it. *See Saban v. U.S. Dept. of Labor*, 509 F.3d 376, 378 (7th Cir. 2007). We are thus obligated to follow the conclusion that increases in the mandatory minimum need not be pleaded in the indictment and proved to a jury—even when a fact increases the minimum so far that the minimum and maximum collide and leave the court with no discretion whatsoever. This case well demonstrates what happens when the principles of *McMillan* are pushed to their extreme.

Under current precedent, the district court was correct in allowing the government to prove to the court at sentencing, by a preponderance of the evidence, that Curry's death resulted from Krieger's distribution of

fentanyl. It was also correct in calculating that the one and only sentence Krieger could receive in light of that finding was twenty years' incarceration.

## C.

Krieger argues, however, that even under this relaxed burden, the court erred when it determined that the government had presented sufficient and reliable evidence to establish by a preponderance of the evidence that Curry's death resulted from the fentanyl. The error must be clear for us to overturn a sentencing court's factual findings. *United States v. Krumwiede*, 599 F.3d 785, 788 (7th Cir. 2010).

The "death resulting" evidence was muddled and slim. Krieger presented evidence that the investigators and doctor performing the autopsy focused exclusively or primarily on the fentanyl evidence while ignoring evidence related to the many other drugs in Curry's system. Moreoever, the doctor who performed Curry's autopsy was a tax cheat, a scofflaw, and had been disciplined for entering into a sexual relationship with a patient to whom he illegally supplied prescription medication. Nevertheless, after evaluating his demeanor on the stand and his evidentiary presentation, the district court concluded that although his testimony about his personal life was not credible, his testimony as to how he conducted the autopsy and how he arrived at his conclusion as to the cause of Curry's death was indeed credible. (R. at 154, pp.6-7). This factual finding regarding demeanor and credibility cannot be over-

turned unless we find that Heidingsfelder was in-credible as a matter of law. *United States v. Carraway*, 612 F.3d 642, 645 (7th Cir. 2010) (noting the "ultra-narrow review" of the trier of fact's credibility determinations based on the witness's demeanor). We do not. After performing the usual internal and external examina-tions, Heidingsfelder collected blood and vitreous fluid samples from Curry and sent them to a private and reputable laboratory in Indianapolis. That lab reported fentanyl in Curry's blood in the toxic to lethal range. Heidingsfelder found no external traumatic injuries and noted physical findings consistent with a drug over-dose. Although Heidingsfelder noted needle marks on Curry's left elbow, and the lab report indicated the presence of several other drugs in Curry's system, Heidingsfelder testified that in his opinion, based on the facts known about her death, his examination of her body, and the lab report, Curry's death was caused by fentanyl toxicity, and not by the other drugs found in her system either taken alone or in combination.

The government, likely because it recognized the prob-lems with its main witness, Dr. Heidingsfelder, called three other experts: Dr. Mark LeVaugh, a physician specializing in forensic pathology, Dr. Michael Evans, a forensic toxicologist, and Dr. Cynthia Morris-Kukoski, a forensic toxicologist employed by the FBI lab. All bolstered Heidingsfelder's finding of a toxic to lethal level of fentanyl.

Krieger called Long, a forensic toxicologist. Long criti-cized Heidingsfelder for failing to test needle marks

on Curry's body, for his choice of location to draw blood, and for recording an incorrect time of death, among other things. He also questioned whether blood samples had been mishandled or placed in vials with the incorrect preservative. Finally he maintained that the reports from the lab used by Heidingsfelder and the FBI laboratory reports were either incomplete or inconsistent with each other. He questioned whether the failure to investigate and follow up on other possible causes of death resulted in an incorrect determination of the cause of death. Nevertheless, he admitted that the lab reports showed the presence of fentanyl in Curry's system in amounts that were four times the therapeutic range and thus potentially lethal.

The police chief in charge of the investigation admitted to inadequate police work in some areas. Officers failed to collect into evidence and send for testing two red capsules in Curry's bedroom. The syringe was not tested until three years after Curry's death, but then was found to contain trace amounts of cocaine.

The district court took these failings into account, but nevertheless found that it was more likely than not that the fentanyl patch provided by Krieger caused Curry's death. The judge appropriately considered and weighed all of the evidence, and we can find no clear error.

As a final matter, Krieger argues in a supplemental filing that the district court erred when it held that the "if death results" language "imposes no requirement of causation." *See* R. at 154, p.12. In a recent opinion, this

court has stated that in determining whether "death results from" distribution of a drug under 21 U.S.C. § 841(b)(1)(C), the government must prove at a minimum "but for" causation—that is, that the death or injury would not have occurred had the drugs not been ingested. *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010). Beyond that minimum causation, the court said, it is not clear what "results from" might mean. *Id.* at 948-49. Elaborating on the term in a jury instruction, the court concluded, most likely makes it more rather than less clear. *Id.* at 949-50. It is true, therefore, that the district court was incorrect when it said "death results" imposes no requirement of causation. But despite what the court said about causation, its actions indicate that it did indeed consider causation. After reviewing the evidence, the court stated, "the Court finds that the evidence presented . . . support[s], by a preponderance of the evidence, Dr. Heidingsfelder's conclusion that fentanyl toxicity was the cause of Ms. Curry's death." R. at 154, p.7. And in conclusion the court held, "[h]aving weighed all of the evidence presented, the Court finds that the Government has established that it is more probable than not that Ms. Krieger's distribution of fentanyl to Ms. Curry resulted in Ms. Curry's death." *Id.* at p.8. The district court properly considered, therefore, whether Curry's death would not have occurred but for the ingestion of the fentanyl.

In sum, under current Supreme Court precedent, the government was not required to include in the indictment the fact that death resulted from the distribution of fentanyl. This fact could be determined by the sen-

tencing court using a preponderance of the evidence standard, provided that Krieger's maximum sentence did not surpass the statutory maximum for distribution of fentanyl without death resulting. Having so determined, the district court did not err in finding that the government proved that Curry's death resulted from Krieger's distribution of fentanyl. The decision of the district court is AFFIRMED.