FILED
United States Court of Appeals
Tenth Circuit

April 30, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 12-4001

DEWEY C. MACKAY, III,

    Defendant-Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 1:10-CR-94-DB-1)**

---

Peter Stirba (Nathan A. Crane and Kathleen Abke with him on the brief), Stirba & Associates, Salt Lake City, Utah, for Appellant.

Elizabethanne C. Stevens, Assistant United States Attorney (David Barlow, United States Attorney, with her on the brief), Office of the United States Attorney, Salt Lake City, Utah, for Appellee.

---

Before **KELLY** and **BALDOCK**, Circuit Judges, and **JOHNSON**, District Judge.[*]

---

**BALDOCK**, Circuit Judge.

The bedrock principle that "no person shall be made to suffer the onus of a

---

[*]The Honorable William P. Johnson, United States District Court Judge, District of New Mexico, sitting by designation.

criminal conviction except upon . . . evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense" is well-settled in our criminal jurisprudence. Jackson v. Virginia, 443 U.S. 307, 316 (1979). We frequently hear appeals from defendants challenging the sufficiency of the evidence, but all too often, defendants misunderstand the standard under which we review their appeal. In application, we review the evidence, both direct and circumstantial, in a light most favorable to the Government. United States v. Kieffer, 681 F.3d 1143, 1152 (10th Cir. 2012). The evidence need not "convince a trier of fact beyond *all* doubt," rather, the evidence "need only reasonably support the jury's finding that the defendant is guilty of the offense beyond a reasonable doubt." Id. Importantly, we have repeatedly emphasized that the evidence, "together with the reasonable inferences to be drawn therefrom, must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." Id. (internal quotation marks omitted). In the present appeal, Defendant Dewey C. MacKay, III, whom a jury convicted of unlawfully prescribing controlled substances, challenges the sufficiency of the evidence underlying several counts of his conviction. He also challenges certain jury instructions, admission of an exhibit and expert testimony, and the legality of his sentence. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. For reasons to follow, we affirm the district court's judgment of conviction, but remand for resentencing.

2

I.

Defendant Dewey C. MacKay practiced medicine in Brigham City Utah. Prior to 2001, Defendant focused his practice on orthopedics. Trial Tr., 73, July 20, 2011. But, because of his own health problems and a desire not to see patients travel to seek treatment, Defendant shifted his practice to pain management. Id. at 74; Trial Tr., 61, August 15, 2011. Defendant maintained a busy practice. From 2001 through 2007, Defendant worked on Mondays and Wednesdays. Trial Tr., 75, July 20, 2011. Between the years 2005 and 2007, Defendant saw, on average, 80 to 100 patients in one day. Id. at 76. These appointments lasted between two and five minutes. Id. at 77, 141, 169. In March 2007, Defendant moved his pain clinic out of the main orthopedic practice in which he had been practicing. In the new office, Defendant worked four days per week for 3.5 to 4 hours per day. Trial Tr., 71, August 9, 2011. As part of this practice, Defendant prescribed his patients opioids, such as oxycodone and hydrocodone, both of which are regulated by the Controlled Substances Act.[1]

A grand jury indicted Defendant on 129 counts, alleging various violations of the Controlled Substances Act. Prior to trial, the Government dismissed 45 counts.

---

[1] Oxycodone is a synthetic derivative of morphine and is a common ingredient in a number of pain medications such as Percocet. Trial Tr., 42, July 27, 2011. OxyContin is the time release form of oxycodone, meaning that a person takes one pill and the medication in that pill is released over a 12 hour period. Id. Hydrocodone is a synthetic derivative of morphine and is the active ingredient in medications such as Lortab and Norco. Id. Oxycodone mixtures are Schedule II substances and hydrocodone mixtures are Schedule III substances.

Thereafter, the district court held a five-week jury trial on the remaining 84 counts. At the close of the Government's case in chief, Defendant moved for a judgment of acquittal on all counts. The district court denied the motion. Defendant renewed his motion after all the evidence had been presented. The district court took the motion as to counts 1 and 2 under advisement, but otherwise denied the motion. Counts 1 and 2 related to a patient who died, allegedly as a result of the prescriptions listed in the counts. The jury found Defendant guilty on 40 counts, including counts 1 and 2. Three counts were for using a telephone in furtherance of drug distribution, while 37 counts were for unlawfully distributing Schedule II and III controlled substances. The district court subsequently issued a written opinion denying Defendant's motion for judgment of acquittal as to counts 1 and 2.

Defendant then filed this appeal, raising six issues.[2] First, Defendant challenges the sufficiency of the evidence supporting the non-death counts. Second, Defendant asserts the district court erred in denying his motion for judgment of acquittal on counts 1 and 2. This argument raises five sub-issues: (1) whether the Government proved the medications were not for a legitimate medical purpose; (2) whether a reasonable juror could find the patient's death resulted from the use of the controlled substances in counts 1 and 2; (3) whether the district court erred in considering an autopsy report as evidence separate and apart from a different medical

---

[2] For clarity, we discuss these issues in a different order than Plaintiff's opening brief.

4

examiner's testimony; (4) whether reasonable doubt existed that the patient's death resulted from the medications Defendant prescribed; and (5) whether the patient's death was a "reasonably foreseeable" consequence of Defendant's prescriptions and whether the district court properly instructed the jury on reasonable foreseeability. Third, Defendant believes the district court erred in permitting Dr. Stacy Hail, a toxicologist, to offer expert opinion testimony. Fourth, Defendant posits the district court erred in admitting Government Exhibit 133, a compilation of charts showing the annual rankings in Utah of the top ten issuers of hydrocodone and oxycodone prescriptions from 2005 through 2009. Fifth, Defendant argues the district court erred in sentencing Defendant to 20 years imprisonment on count 1. Sixth, and finally, Defendant contends the district court committed plain error when it imposed a general sentence of 240 months as to all the counts. We address each argument in turn.

## II.

The Controlled Substances Act prohibits a person from dispensing or distributing a controlled substance.[3] 21 U.S.C. § 841(a)(1). But a physician is

---

[3] Title 21 U.S.C. § 841(a)(1) provides: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." The penalty section provides that "any person who violates subsection (a) [of § 841] shall be sentenced as follows: . . . In the case of a controlled substance in schedule I or II, . . . such person shall be sentenced to a term of imprisonment of not more than 20 years . . . ." 21 U.S.C.

(continued...)

5

exempt from this prohibition as long as he is registered and acting as authorized. 21 U.S.C. §§ 802(21), 822(b). For a controlled substance prescription to be effective, the prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Defendant challenges his convictions relating to Michelle Russell, Scott Blanscett, Kade Brown, Billy Ray Cower, Allan Starr, Jennifer Johnson, and Robert Stubblefield. In order to convict Defendant on the applicable counts, namely 4–7, 18–26, 32–35, 41–42, 81–84, 108, 120–121; and 123–124 (the non-death counts),[4] the jury had to conclude beyond a reasonable doubt that Defendant knowingly and intentionally prescribed the controlled substances to each of these patients outside the usual course of medical practice or without a legitimate medical

---

[3](...continued)
§ 841(b)(1)(C). The statute further states that "in the case of any controlled substance in schedule III, such person shall be sentenced to a term of imprisonment of not more than 10 years . . . ." 21 U.S.C. § 841(b)(1)(E)(i).

[4] In his opening brief issue statement and heading for the section, Defendant states he is challenging the sufficiency of the evidence on counts 4–7, 18–26, 32–35, 41–42, 81–84, 108, and 120–124. He also requests in his conclusion to his opening brief that we vacate his conviction on those counts. But, in one sentence of his opening brief, Defendant provides a different set of counts which includes counts 8–17, but excludes count 122. In his reply brief, Defendant explicitly states he is not appealing his conviction on counts 8–17. Because Defendant, in his issue statement and conclusion of his opening brief, as well as in his reply brief, asks us to vacate the convictions only on counts 4–7, 18–26, 32–35, 41–42, 81–84, 108, and 120–124, those are the counts we consider on appeal, with the exception of count 122, which never existed in the indictment because of a numbering error.

6

purpose.[5] <u>United States v. Nelson</u>, 383 F.3d 1227, 1232 (10th Cir. 2004).

In conducting our de novo review, "we must examine whether, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." <u>United States v. Cooper</u>, 654 F.3d 1104, 1115 (10th Cir. 2011) (internal quotation marks omitted). We do not, however, "weigh conflicting evidence or consider witness credibility." <u>Id.</u> Moreover, "the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient." <u>Id.</u>

Defendant claims his case is unique because the Government did not charge him with healthcare fraud, conspiracy, or any other crime indicating a scheme by which Defendant sought to gain from unlawful prescribing. Defendant asserts the Government did not contend that every prescription Defendant wrote to the patients listed in the indictment was unlawful. Rather, Defendant believes the Government

---

[5] We note the district court incorrectly instructed the jury they must find "that the defendant knowingly and intentionally prescribed the controlled substances outside the bounds of professional medical practice *and* not for a legitimate medical purpose." Jury Instruction 16 (emphasis added); <u>see</u> <u>also</u> Jury Instructions 20 and 22. In 2004, we held that "[a] practitioner has unlawfully distributed a controlled substance if she prescribes the substance either outside the usual course of medical practice *or* without a legitimate medical purpose." <u>Nelson</u>, 383 F.3d at 1231–32 (emphasis added). This distinction is unimportant in this case, however, because the evidence was sufficient for the jury to conclude Defendant prescribed the controlled substances outside the usual course of medical practice and without a legitimate medical purpose.

charged a violation of the Controlled Substances Act based on insufficient details in Defendant's charts for prescribing to a particular patient on a particular day. Defendant posits one doctor's subjective opinion of another's charting practices is not evidence of unlawful prescribing. Alternatively, Defendant contends that if the evidence against him amounted to a criminal violation of the Controlled Substances Act, his due process rights were violated because the statute failed to provide him with notice that his conduct was prohibited. Defendant argues that no other physician has engaged in analogous conduct and been prosecuted. Therefore, he had no way of knowing his conduct would subject him to prosecution. In addition, he asserts the language "outside the usual course of professional medical practice" and "without a legitimate medical purpose" is overly broad and vague.

The Government contends Defendant waived his sufficiency challenge on the non-death counts because of inadequate development of any factual or legal issues. But even if we review the challenge, the Government argues Defendant cannot prevail. The Government cites evidence that Defendant did not take adequate medical histories, failed to conduct physical exams, provided excessive quantities of drugs, and provided prescriptions to patients he never saw. The Government states patient visits were extremely short and consisted of Defendant asking the patient if he or she wanted a refill, with no medical examination or determination that the drugs provided the patient any benefit. The Government states Defendant provided prescriptions to his patients with knowledge that the patient was doctor shopping,

8

abusing his or her medication, had shared his or her medication, or had taken Suboxone to treat narcotic abuse.[6]  The Government also cites to evidence that Defendant provided early refills, saw an excessive number of patients per day, took no vital signs, and had cut and paste entries on his medical charts.

We disagree with the Government that Defendant waived his sufficiency challenge.  We therefore turn to the merits of Defendant's claim.  At trial, all seven of these patients testified.  In addition, Dr. Bradford Hare, a pain management doctor, testified about his review of Defendant's charts concerning those patients.  Although Defendant did not make an individual argument for each patient, we believe we must examine whether the Government provided sufficient evidence to show Defendant prescribed controlled substances to each patient outside the usual course of medical practice and without a legitimate medical purpose.

A.

1.

We first look at the evidence the jury heard regarding Michelle Russell, the patient involved in counts 4–7.  Russell began seeing Defendant because of some tenderness in her wrist.  Trial Tr., 101, July 27, 2011.  Defendant found the tenderness, but did no further exam and took no x-rays.  Defendant prescribed

---

[6] Suboxone is a synthetic opioid combined with a narcotic antagonist.  Trial Tr., 50, July 27, 2011.  Suboxone treatments are used to treat narcotic abuse.  Id. at 138.

9

Lortab. Russell continued to see Defendant, but Defendant noted no further evaluation of the wrist pain in her chart. Id. at 102. Another doctor referred her back to Defendant for possible carpal tunnel syndrom, but Defendant continued to prescribe Lortab. At some point, Defendant added to Russell's chart that she was having lower back pain, but the chart did not indicate Defendant evaluated the back pain. Id. at 103. Defendant eventually diagnosed Russell with degenerative disc disease. Id. at 104. But the chart does not suggest that Defendant conducted an examination or ordered any tests, such as an M.R.I. scan that would have justified that diagnosis. Based on his review of the file, Hare concluded no medical justification existed for the prescriptions and that Defendant prescribed the Lortab for no legitimate medical purpose. Id. at 105.

Michelle Russell testified at trial. She stated that although she told Defendant she had wrist pain, she lied in order to get medication. Trial Tr., 110, August 4, 2011. Russell testified that Defendant grabbed one of her wrists and examined it. He did not run any tests and wrote Russell a prescription. She testified she would not have gone back to Defendant had he not prescribed Lortab, but he did so on a monthly basis. The only other time Defendant examined Russell was when she complained about her back. Id. at 111. The exam consisted of Russell standing up and then bending over. During the time Russell visited Defendant, she admittedly was "doctor shopping," which means she received the same prescription from more than one doctor. Id. at 116. Eventually, the Drug Enforcement Administration asked

10

Russell to go undercover. At one of these undercover visits, Defendant was already writing Russell a prescription for Lortab when she walked into his office and Defendant did not perform an exam or inquire about her pain or medical condition. Id. at 124–25.

2.

Counts 18–26 involved Scott Blanscett. Blanscett came to Defendant's office complaining of an injury to one of his toes. Trial Tr., 123, July 27, 2011. Defendant prescribed Blanscett hydrocodone and Lortab. Dr. Hare concluded Defendant did not issue the drugs to Blanscett for a legitimate medical purpose based on Defendant's evaluation of the patient. Id. at 123. Prior to seeing Defendant, and throughout the time Defendant was prescribing medication for Blanscett, Blanscett was receiving at least as much medication, if not more medication, from other doctors. Id. at 125. Defendant did not detect this. Hare was concerned about the lack of follow-up information, and no indication that Blanscett was deriving any benefit from the prescriptions. Id. at 126. Hare noticed a number of early refills when the direction on the prescriptions would indicate a certain duration for the prescription. Id. at 130. Hare testified Blanscett sometimes would use his medications twice as fast as prescribed. Blanscett claimed to have lost prescriptions, but the controlled substance database maintained by the Utah Division of Occupational and Professional Licensing showed Blanscett had in fact filled the prescription. Defendant did not draw any controlled substance database samples during the time he was treating

11

Blanscett. Id. at 134. Defendant eventually detected Blanscett's abuse, but not until the end of their time together.

Blanscett testified that he went to see Defendant for his toe. Trial Tr., 146, August 1, 2011. Defendant looked at his toe and gave him a prescription for hydrocodone, but nothing in the medical record indicates Defendant prescribed hydrocodone on that first visit. Blanscett testified Defendant did not take any kind of history and did not listen to his heart. Id. at 148. Defendant also prescribed Blanscett Percocet in April 2006, though it was not indicated on his medical chart. Id. at 149. During this time period, Blanscett admitted receiving OxyContin and hydrocodone from other doctors. Id. at 153. The Government asked Blanscett why he kept going back to see Defendant. Blanscett responded, "Because I could." Defendant did x-ray Blanscett's ankle and told Blanscett he did not have a major tear or break. Id. at 155. Blanscett testified that he once received a prescription from Defendant without seeing him. Id. at 164. Blanscett called Defendant and told him he needed a refill and Defendant "said he would drop it off at the Brigham City emergency area place there" for Blanscett to pick up. Id. at 165. The prescription was in an envelope, pinned to a corkboard in the hospital.

3.

Kade Brown is the patient relating to counts 32–35 of the indictment. Hare testified Defendant, in his physical examination of Brown, believed Brown was

neurologically intact.[7] Trial Tr., 112, July 27, 2011. The medical record does not provide any indication of what tests Defendant performed to make the determination that Brown was neurologically intact. Hare stated he would expect to see that information in the chart. Defendant prescribed Brown OxyContin. Hare believed the specific dosage was too high for the patient. Id. at 113. Hare further testified that Defendant did not have a legitimate medical purpose in prescribing the OxyContin. Later, Defendant diagnosed Brown with degenerative disc disease, but Hare could find no evidence in the chart that Defendant had been able to diagnose that disease. Id. at 117. Moreover, Hare saw no evidence in the chart that Defendant had received diagnoses from other physicians in consultation that provided a basis for the diagnosis. Hare concluded that each of the prescriptions Defendant prescribed for Brown were not issued for a legitimate medical purpose. Id. at 120.

Kade Brown testified that, at his first visit to Defendant, Defendant did not run tests, did not take his blood pressure, did not listen to his heart, did not listen to his lungs, did not look in his throat or nose, did not take his temperature, and did not take his weight. Trial Tr., 28, July 22, 2011. Instead, Defendant "poked [his] back and kind of touched [his] back." Brown's second visit was for a refill of the

---

[7] If a physician believes that a neurologic examination is not needed on a patient because that patient "seems to walk and talk pretty normally and moves around pretty normally . . . the patient seems to be neurologically intact," which means the nervous system seems to be functioning normally. Trial Tr., 66, July 27, 2011.

13

OxyContin. At the follow up visit, Defendant again did not take any history, run any tests, or check any vitals. Id. at 31. Brown testified that at subsequent visits, Defendant "didn't do anything. He just came in and said hi and we talked for a minute and I got the refills." Id. at 33. Twelve days after his third visit, Brown had taken all of his 30-day supply of OxyContin, so he returned for a refill. Id. at 34. Defendant gave Brown another full prescription at that time. The next month, Defendant doubled Brown's dosage. Id. at 35. Brown testified nothing was different with respect to that visit. Although Defendant talked to Brown about performing an M.R.I. scan, Brown never had one done. Id. at 36. Brown stated that he could not afford the scan. Id. at 103. At one point, Brown and Defendant talked about Brown doctor shopping because Brown had received a prescription from an "instacare" facility. Id. at 38. Defendant cautioned Brown and they agreed Brown would not doctor shop. Id. at 39. Despite Brown having previously signed a controlled substances contract with Defendant, a document agreeing that a specific physician will be the only provider of medication for a patient, Defendant did not terminate Brown as a patient. Defendant did not change his medication or dosage or place Brown under any limitations. Id. at 40. On March 13, Defendant prescribed Brown OxyContin 40 and Lortab. He went through those medications quickly and came back 13 days later. Id. at 45.

Even though Defendant noted in Brown's chart that Brown had degenerative disc disease, Defendant never relayed this diagnosis to Brown. Id. at 46. Moreover,

14

Brown never had an M.R.I. scan or x-ray of his back. Brown continued to go through his monthly supply of medications quickly and returned consistently before his monthly appointment. Id. at 47. Defendant continued to prescribe Brown full prescriptions despite the shortened time period between appointments. Id. at 48. To make matters worse, Brown's insurance had stopped paying for the pain medication. He began selling some of the medication in order to pay for the drugs. Id. at 49. When he would run out of pills and could not see Defendant, Brown would turn to heroin. On one occasion, Brown had gone through his pills in eight or nine days because he sold them. Id. at 51. Brown told Defendant that he threw them away because they were too strong. Brown testified Defendant told him "people like us don't throw pills away." Id. at 52. Brown took that statement to mean "an addict, a junkie." Defendant refilled his prescription, but gave him 60 pills of a lower dose. Brown returned twelve days later after he had gone through all the pills. Defendant provided Brown with a prescription for 90 pills. Once Defendant moved into his new office, the process moved faster. Id. at 59. Brown would check in at the front desk. Then someone would call him back and Defendant was ready to see him. "The visit would take place with the same introduction. Hi. How are you? Refills? Yes. Any problems? No. Then he would write it out or they would already be written out, and then I would take them and go." Id.

4.

Counts 41 and 42 relate to Billy Ray Cower. Again, Hare testified that

15

Defendant did not have a legitimate medical purpose to issue the prescriptions to Cower. Trial Tr., 135, July 27, 2011. Hare believed Defendant prescribed Percocet to Cower based on the diagnosis of Osgood-Schlatter disease, a condition sometimes known as "growing pains" among adolescents. Id. at 136. Hare stated this condition is an intermittent problem, and not a continuous chronic pain problem. Hare suggested that at no point did Defendant have adequate information to prescribe him controlled substances. Id. at 136–37. Over time, the number of Percocet pills increased. Id. at 137. Nothing in Cower's medical chart showed that the medication provided Cower any benefit. In December 2007, a message on Defendant's answering machine alerted Defendant that Cower was receiving Suboxone treatments. Id. at 138. A subsequent notation from January 2007 indicated that Defendant would "step aside" to let Cower continue the Suboxone treatment. Cower, however, requested oxycodone and Defendant obliged him.

Cower testified that at his first visit, he told Defendant he had been diagnosed with Osgood-Schlatter when he was younger. Trial Tr., 176, July 28, 2011. Defendant examined Cower's knees and then Defendant asked Cower if he needed anything for pain. Other than stating he had Osgood-Schlatter disease, Cower provided no other history to Defendant. Defendant did not check Cower's blood pressure, weight, heart, or lungs. Id. at 177–78. At later visits, Cower would go in to a room, Defendant would ask if he needed a refill, then Defendant would write the prescription and Cower would leave. Id. at 178. Defendant never performed an

16

exam or took vitals before increasing a dosage.  Id. at 182.  Defendant wrote in Cower's chart that he suffered from degenerative arthritic knees, but never told Cower of the diagnosis.  Id. at 181.

Cower began feeling nauseous if he stopped taking his medication.  Id. at 185. He had cold sweats and could not sleep.  He was shaky, had diarrhea, and felt like he had the worst flu he had ever had in his life.  Defendant never explained the consequences of withdrawing from the medication to Cower and never developed a treatment plan.  Once Defendant moved into his new office, Cower's visits became shorter.  Id. at 186.  Cower would walk in, pay his co-pay and sit down for a few minutes.  Then he would be called into the office and asked if he needed a refill. Cower would then leave after obtaining the refill.

5.

Hare also reviewed patient Allen Starr's medical chart.  Starr was the patient named in counts 81–84 of the indictment.  Hare believed Defendant's evaluation of Starr's history, physical examination, and follow-up treatment was inadequate to support the prescription of the amount of opioid medications. Trial Tr., 148, July 27, 2011.  Starr was eighteen years old and had back pain for four months before seeing Defendant.  His x-rays were normal and he was neurologically intact.  Id. at 149. Hare believed Starr's family pushed to get Starr on opioids. Defendant escalated the amount of methadone he prescribed to Starr without explaining in the chart why he changed the dose.  Id. at 150.  By the time Starr turned 20 years old, Defendant

17

diagnosed him with degenerative disc disease, but Hare stated nothing in the medical record supported that diagnosis. Id. at 152.

Starr testified he asked Defendant about OxyContin on the first visit. Trial Tr., 153, August 3, 2011. Defendant told him he had never prescribed OxyContin for an 18 year old. Starr's stepmother then asked about methadone. Defendant provided him with methadone without performing a physical examination. Id. at 152. Defendant did not warn Starr about the effects of methadone. Id. at 153. One summer, Starr worked in New Mexico. Id. at 161. Starr obtained four prescriptions for methadone from Defendant without returning to Utah. Starr said he would arrive at Defendant's office, sit down at his table, and Defendant would ask if Starr needed a refill. Id. at 163. Defendant would write Starr a refill without examination and Starr would leave. Id. at 164. Defendant eventually added Lortab to Starr's prescription of methadone, but after the Lortab made Starr sick, Starr switched to Percocet. Id. at 164–65.

Starr left Utah and did not see Defendant for over one year. Id. at 180. When Starr returned, Defendant had moved to his new office. Defendant did not run any new tests and did not tell Starr he was diagnosing him with degenerative disc disease. Id. at 180–81. Starr did not provide Defendant with the M.R.I. scans that other doctors had ordered during the year away. Id. at 181. Once Defendant moved to his new office, Starr would sit down and explain how he was feeling more pain and Defendant would write a refill. Id. at 183. Starr would then leave.

18

6.

Jennifer Johnson was the patient named in count 108. Hare testified Defendant did not prescribe the controlled substances listed in the indictment for a legitimate medical purpose. Trial Tr., 157, July 27, 2011. Hare said Defendant's initial evaluation of Johnson was inadequate to support the prescribing of the controlled substances. And as Johnson proceeded through treatment with Defendant, Hare believed the fact that she was obtaining medications from many doctors simultaneously to his prescribing was evident. Defendant noted in Johnson's chart at the initial visit that Johnson stated the only medication she was taking was Xanax. Id. at 158. A check of the controlled substances database at the time would have showed she was obtaining hydrocodone "pretty continuously" for several years prior from another doctor. In another patient's chart, Johnson was labeled as a doctor shopper. This note from April 23, 2008 indicated that Defendant said he talked to Johnson, but the subject is not noted in Johnson's chart. Id. at 159. Approximately four to six weeks later, another indicator from the narcotics strike force appeared in Johnson's file that she was continuing to get prescriptions from other providers. At that point, Defendant stated he would not see her again. Id. at 160. Defendant, however, continued to prescribe Johnson Aprazolam, an abusable substance, through November 2008 and prescribed Lortab once in November 2008.

Johnson testified that Defendant did look at x-rays taken by an emergency room physician and asked about a car accident. Trial Tr., 125, July 28, 2011.

19

Defendant did not weigh Johnson, did not take her blood pressure, did not listen to her heart or to her lungs, did not take her temperature, and did not look in her mouth, ears, or nose. Id. at 125–26. Defendant looked at her back and pressed on parts of her back and prescribed her Lortab. Id. at 126–27. When Defendant practiced in his old office, Defendant would ask her if she needed a refill and she would say "yes." Id. at 128. Defendant would write out the prescription, talk into a recorder, and record what transpired at the visit. Defendant did not perform any evaluations at subsequent visits, even when he doubled her dosage. Id. at 128, 132. Defendant diagnosed Johnson with degenerative disc disease, but never informed her of the diagnosis. Id. at 135. In November 2008, Johnson attempted to commit suicide by cutting her wrist. Id. at 141–42. After leaving the emergency room after being treated for the suicide attempt, Johnson walked to Defendant's office and scheduled an appointment for a few days later. At the appointment, Defendant did not ask her what had been happening in her life, did not ask her about the emergency room visit, and did not mention the bandage on her hand. Id. at 142. Defendant asked Johnson whether she was still taking Suboxone and she said no. He then provided her with Lortab. During the 2008 period, Johnson was taking 25 to 50 Lortab pills per day. Id. at 143.

7.

Finally, we turn to patient Robert Stubblefield, who was the subject of counts 120–121 and 123–124 of the indictment. Hare again concluded Defendant did not

20

issue the prescriptions to Stubblefield for a legitimate medical purpose. Trial Tr., 161, July 27, 2011. Hare said Stubblefield was 25 years old and had back pain from a recent fall and some diffuse tenderness. Id. at 162. Stubblefield was neurologically intact. Although Hare said short-term prescriptions may have been justified, a long-term prescription of increased doses of pain medication with no further evaluation was not justified. Stubblefield began doctor shopping. Defendant wrote in Stubblefield's chart that he would be willing to see him if he was the only prescriber. Id. at 163. Defendant told Stubblefield he would check the database every other visit. But Hare testified no one in the office ran a check of the database. In addition, Defendant prescribed early refills for Stubblefield. Trial Tr., 10, July 28, 2011. In November 2006, Defendant prescribed OxyContin and Percocet to Stubblefield. He returned two weeks later and Defendant refilled the same medication "with really no indication of any further problems or issues." Id. Hare described this use of Stubblefield's medication as a "fairly continuous pattern." Id. at 11.

Stubblefield testified that at his first visit to Defendant, Defendant did not take a medical history or perform a physical examination before giving him a prescription for Percocet. Trial Tr., 63–64, July 29, 2011. At the second visit, Defendant told Stubblefield that he had not yet received his medical records, but if he needed a refill, he would write a prescription. At the third visit, Defendant increased Stubblefield's dosage. Id. at 65. Defendant had Stubblefield sign a controlled

21

substances agreement. But the next notation in the chart is a conversation regarding Stubblefield's arrest for falsifying a prescription and Stubblefield's problems with doctor shopping. Id. at 67–68. Defendant did not terminate the relationship and continued prescribing for Stubblefield. Id. at 68. As to his early refills, Stubblefield said he would call the office to make an early appointment. He said, "[m]aybe once it became an issue that we were early, but we would do it every month." Id. at 84.

B.

Defendant asserts the Government's chief evidence was Dr. Hare's subjective opinion of Defendant's charting practices, which does not amount to unlawful prescribing. The jury did not convict Defendant for failing to chart correctly. Hare looked at Defendant's charts. He explained to the jury that no legitimate medical basis existed to prescribe the medications in the quantity and over the time span Defendant prescribed to *each* indictment patient in this appeal. The charts revealed such activities as early refills on prescriptions, lack of depth in examinations, and instances where Defendant recorded a diagnosis without relaying that information to the patient. Accordingly, the evidence to support his conviction came from the information gleaned from the charts, not one doctor's subjective opinion of another's charting practices.

Defendant additionally contends Hare did not testify the medications Defendant prescribed were "incorrect" to treat each patient's pain or that the quantity was unreasonably high. We disagree. Hare testified that no medical justification

22

existed for the prescriptions Defendant wrote Russell and that Defendant prescribed the Lortab outside of a legitimate medical purpose. Trial Tr., 105, July 27, 2011. Hare testified Blanscett was receiving narcotics from other doctors and that Defendant was providing early refills without any indication the medications were helping Blanscett. Id. at 125–26, 130. Hare stated Defendant's prescribed dosage for Brown was too high. Id. at 112. As to Cower, Hare believed Defendant never had adequate information or a diagnosis to allow Defendant to initiate the prescribing of controlled substances. Id. at 136–37. Hare stated no information supported prescribing the amount of opioid medications Defendant prescribed to Allen Starr. Id. at 148. As to Johnson, Hare found inadequate support to justify prescribing controlled substances and added that a check of the controlled substances database would have shown she was obtaining hydrocodone on a regular basis. Id. at 157–58. Finally, Hare testified that long-term prescribing of increased doses of pain medication to Stubblefield with no further evaluation was unjustified. Id. at 162.

Defendant further argues the Government is unable to point to any specific evidence that shows Defendant stepped out of his role as a physician and into that of a criminal drug dealer. But the above trial testimony reveals the Government did present evidence as to each patient named in the non-death counts. Dr. Hare stated that Defendant prescribed to each patient without a legitimate medical purpose. And each of these patients backed up Hare's testimony. Moreover, the front desk receptionist testified that on two days when Defendant was sick, she gathered the

23

charts for that day and another staff member took the prescription pad to Defendant's home. Trial Tr., July 20, 2011, 164–65. The receptionist saw the staff member return with the charts and prescriptions that Defendant signed. Id. The receptionist did not cancel the appointments. Instead, she greeted the patients and put them in a room. Id. at 166. A staff member would go into the room and give the prescription to the patient and say that Defendant was ill that day. Id. The patient would leave, check out at the back desk, and make his or her next monthly appointment. Id.

Despite the above facts, Defendant attempts to distinguish the facts of his case from two cases in which he states the physician engaged in blatant criminal conduct. In the first case, United States v. Moore, 423 U.S. 122 (1975), the Supreme Court determined persons registered under the Controlled Substances Act could be prosecuted under the Act. The Supreme Court stated Moore had "conducted a large-scale operation." Id. at 126. Three District of Columbia pharmacies filled 11,169 prescriptions from Moore over a 5.5 month period. On 54 days during that time period, Moore wrote over 100 prescriptions a day. Moore billed his patients using a "sliding-fee scale" based on the quantity prescribed. Moore gave his patients only "the most perfunctory examination," consisting of a request to see the patient's needle marks and an unsupervised urinalysis. Id. Moore performed no physical exams at follow up appointments, did not keep accurate records, did not record the quantity of drugs prescribed, and did not supervise the administration of the drug.

Defendant also cites United States v. Feingold, 454 F.3d 1001 (9th Cir. 2006).

24

Feingold prescribed controlled substances to patients he never physically examined. He did not record the medical basis for prescribing the drugs in his patients' medical charts. Feingold prescribed controlled substances to recovering addicts and prescribed in excess of the maximum dosages he recommended. In one case, Feingold prescribed more than 3,000 pills to a patient in a single month. Two of Feingold's patients were undercover DEA agents. Even with all of this evidence, Feingold insisted he had been prescribing the drugs in good faith to help his patients manage their pain. Id. at 1006.

Defendant attempts to distinguish his case by arguing that all of the indictment patients were his actual patients and not undercover law enforcement, although two of his patients later became confidential informants. Defendant further reasons all of the prescriptions at issue were in the context of a regular doctor visit and no evidence suggested that he ever charged based on the number of prescriptions or the quantity or type of medications. Defendant fails to see his conduct is similar to the defendants' conduct in the cases he cites. Neither the Supreme Court in Moore, nor the Ninth Circuit in Feingold stated that a specific set of facts had to be present in order to find that a physician stepped outside of his role and issued prescriptions without a legitimate medical purpose. Both cases looked to the facts in the record to conclude enough facts existed for a fact finder to affirmatively determine that the physician issued the drugs for an improper purpose. Defendant argues that his patients legitimately experienced pain. Even assuming each patient had pain, a

25

doctor may still prescribe medications without a legitimate medical purpose. Hare's testimony, as well as the testimony of the patients, illustrates this very point.

Viewing the evidence in the light most favorable to the Government, we conclude the evidence in this case is quite sufficient to support Defendant's convictions on the non-death counts. See Moore, 423 U.S. at 142 (evidence that the defendant physician "gave inadequate physical examinations or none at all," "took no precautions against [prescription] misuse or diversion," and "did not regulate . . . dosage" was sufficient to prove that "conduct exceeded the bounds of 'professional practice'"); Feingold, 454 F.3d at 1004–05 (evidence was sufficient where doctor prescribed large quantities of controlled substances without conducting physical examinations or recording bases for the prescriptions in medical charts "overwhelmingly demonstrated his disregard for proper prescribing practices"); United States v. Tran Trong Cuong, 18 F.3d 1132, 1139 (4th Cir. 1994) (holding evidence sufficient to support conviction where doctor prescribed pain medication for "nebulous" ailments after "superficial physical examinations").

## C.

We now address Defendant's alternative argument that the Controlled Substances Act failed to provide him with fair notice and that the statute is vague.[8]

---

[8] Defendant argues that the language, "outside the usual course of professional medical practice" and "without a legitimate medical purpose," is so broad that it can encompass a great deal of lawful conduct. To the extent Defendant attempts to

(continued...)

26

"Elemental to our concept of due process is the assurance that criminal laws must 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' and those that fail this test are treated as no laws at all: they are 'void for vagueness.'" United States v. Lovern, 590 F.3d 1095, 1103 (10th Cir. 2009) (quoting Colautti v. Franklin, 439 U.S. 379, 390 (1979)). A vagueness challenge to a statute that does not involve the First Amendment "must be examined in light of the facts of the case at hand." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982). Defendant argues no other physician who conducted himself or herself in the same manner has ever been prosecuted under the Controlled Substances Act. Accordingly, he could not know he engaged in prohibited conduct. Despite his emphatic stance, Defendant acknowledges one factually analogous case, but dismisses its importance because the Eleventh Circuit reversed and remanded the defendant's conviction on all counts. United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012). Unfortunately for Defendant, before the Eleventh Circuit announced it reversed because of a Confrontation Clause issue, the court stated the evidence was sufficient to support the Defendant's conviction. Id. at 1229.

As applied to Defendant, the Controlled Substances Act is not vague.

---

[8](...continued)
attack the statute as overbroad using the regulatory language, we disagree. "[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad." Schall v. Martin, 467 U.S. 253, 268 n.18 (1984).

Ignasiak aside, we conclude Defendant had notice the statute prohibited his conduct based on our own circuit case law.[9] United States v. Jamieson, 806 F.2d 949, 951 (10th Cir. 1986) (prescribing doctor gave drugs when patients asked for them and wrote prescriptions when patients took drugs more frequently than directed); United States v. Varma, 691 F.2d 460, 464 (10th Cir. 1982) (prescribing doctor took incomplete medical histories and gave short and inadequate physical examinations). Defendant had several years of experience as a doctor. At trial, Defendant testified that a doctor has a responsibility to evaluate whether a patient is adversely affected by prescriptions and to make sure his patients are complying with medication agreements. Trial Tr., 70, August 16, 2011. Defendant also admitted at trial that he did not look at certain controlled substance database reports. Id. at 83, 85, 98, 106. Further, he often did not question his patients' excuses for early refills because he trusted them, even when looking to the controlled substance database would have shown those patients filled the original prescription. Id. at 83. Patient testimony revealed Defendant did not conduct follow-up examinations before writing

_____

[9] Even though we conclude Supreme Court and circuit precedent foreclose Defendant's due process argument, we must address Defendant's underlying premise of this argument. Defendant's assertion his due process rights were violated because he was the first doctor engaging in this conduct to be prosecuted is simply untenable. Although the Due Process Clause "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," United States v. Lanier, 520 U.S. 259, 266 (1997), the Due Process Clause does not bar the Government from filing charges against a defendant if his conduct is within the scope of the statute, even when the Government has never filed such charges in the past.

28

prescriptions for refills. A reasonable jury could find Defendant knowingly prescribed controlled substances outside the usual course of medical practice and without a legitimate medical purpose. Based on the record, we cannot say Defendant was the victim of a law he did not understand.

### III.

Next, Defendant argues the district court erred in denying his motion for judgment of acquittal on counts 1 and 2. Recall count 1 alleged Defendant prescribed oxycodone in violation of the Controlled Substances Act to David Wirick, resulting in Wirick's death and count 2 alleged Defendant prescribed hydrocodone in violation of the Controlled Substances Act to Wirick, also resulting in Wirick's death. In addition to having to prove that Defendant knowingly and intentionally prescribed the controlled substances outside the usual course of medical practice or without a legitimate medical purpose, the Government, to convict Defendant on counts 1 and 2, also had to prove Wirick died as a result of taking the prescribed medications and that his death was reasonably foreseeable.[10] At oral argument, the Government addressed what it believed to be a circuit split on the issue of whether

---

[10] The penalty section of § 841 provides that "[i]n the case of a controlled substance in schedule I or II [i.e., oxycodone], . . . if death or serious bodily injury results from the use of such substance [such person] shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . ." 21 U.S.C. § 841(b)(1)(C). "[I]n the case of any controlled substance in schedule III [i.e., hydrocodone mixtures], . . . if death or serious bodily injury results from the use of such substance [such person] shall be sentenced to a term of imprisonment of not more than 15 years. 21 U.S.C. § 841(b)(1)(E)(i).

29

the "death having resulted from" language in the indictment is an enhancement or an element of the offense. Compare United States v. Krieger, 628 F.3d 857, 867 (7th Cir. 2010) (concluding mandatory minimum provision in § 841(b) is a sentencing enhancement provision); with United States v. Burrage, 687 F.3d 1015, 1023–24 (8th Cir. 2012) (referring to "death resulted from" as an element without analysis). Because we hold the Government presented sufficient evidence to prove the oxycodone resulted in death and the hydrocodone resulted in death, we need not address this issue. We also must add that because the Government requested an instruction on reasonable foreseeability, it was required to prove that element. United States v. Romero, 136 F.3d 1268, 1273 (10th Cir. 1998) ("the Government is required to prove all elements put forth in unchallenged instructions to the jury, even if the Government would not, under law, be otherwise required to do so"). As we will discuss in further detail below, because of the posture of this case, we do not opine on whether § 841(b)'s language contains a foreseeability or proximate cause requirement.

## A.

Wirick was a former firefighter who severely injured his back on the job. Wirick began seeing Defendant in 1999 and continued to see him for approximately seven years. In January 2006, Wirick overdosed on methadone Defendant had prescribed him. After the overdose, Wirick and his family physician, Dr. Stephen Bruce, agreed that Bruce would exclusively treat Wirick. Trial Tr., 27, August 3,

30

2011. A few months after the agreement, Wirick went to see Bruce, but Bruce was out of town. Id. at 40. Wirick asked another doctor in Bruce's practice for an early refill of pain medication, but that doctor refused. Wirick then went to see Defendant on May 3, 2011. On that day, Defendant billed 92 patients in six and a half hours. Trial Tr., 30, July 28, 2011. Defendant prescribed Wirick both oxycodone and hydrocodone. Three days later, Wirick died. Count 1 alleged Defendant knowingly and intentionally distributed 60 ten-milligram oxycodone tablets to Wirick. Count 2 alleged Defendant knowingly and intentionally distributed 90 ten-milligram hydrocodone tablets to Wirick. Counts 1 and 2 further alleged Wirick died as a result of taking the prescribed medications.

The Government introduced Wirick's autopsy report, prepared by Dr. Maureen Frikke. At the time of trial, Frikke was deceased. Dr. Todd Grey, Utah's Chief Medical Examiner, testified as to the cause of death. He posited Wirick died as a result of the combined effects of drug toxicities, specifically the combination of oxycodone and Valium as well as pneumonia. Dr. Grey testified the level of hydrocodone was below the limit of what is considered potentially toxic and the level of oxycodone was in the therapeutic range. He further testified that pneumonia itself was potentially lethal. Dr. Stacy Hail, a toxicologist, also testified. Dr. Hail reviewed the autopsy report and testified that Wirick died of drug toxicity because of the presence of hydrocodone, oxycodone, and Valium. Dr. Hail excluded pneumonia as an immediate cause of death. Dr. Michael Baden, Defendant's expert,

31

opined that Wirick died from a severe case of undiagnosed pneumonia and that Wirick's drug levels were normal for people who used narcotics for prolonged periods of time.

At the close of the Government's case, Defendant made his oral motion for judgment of acquittal. The district court denied the motion, concluding sufficient evidence existed in the Government's case in chief from which a rational fact finder could find guilt beyond a reasonable doubt. At the end of trial, Defendant renewed his motion on all counts, but stated he wanted to particularly focus on counts 1 and 2. The district court sent the case to the jury, but took the renewed Rule 29 motion under advisement as to counts 1 and 2. After trial, Defendant filed a memorandum in support of his motion for acquittal on counts 1 and 2. The district court issued a written order denying the motion for judgment of acquittal on counts 1 and 2. The court concluded that the facts, attending circumstances, and reasonable inferences provided evidence on which a jury could conclude beyond a reasonable doubt that Defendant acted outside the bounds of professional practice and without a good faith belief that his prescriptions for Wirick were for a legitimate medical purpose. The district court further concluded the evidence was sufficient for the jury to reasonably conclude beyond a reasonable doubt that the drugs in Wirick's system came from Defendant's prescriptions, the use of the oxycodone and hydrocodone resulted in Wirick's death, and the death was reasonably foreseeable.

B.

Defendant first argues the Government did not prove Defendant prescribed Wirick the medications for any purpose other than a legitimate medical purpose. Defendant points to the trial testimony of Dr. Bruce and Wirick's wife and son regarding Wirick's documented chronic, severe lower back pain. Trial Tr., 25, 70, 76, 112–13, August 3, 2011. Defendant suggests no evidence showed Wirick took medications for recreational purposes or sold them to others. Defendant asserts this testimony proves that Wirick was in constant pain and Defendant prescribed the prescriptions within the bounds of professional medical practice for the legitimate medical purpose of pain management. Defendant also states Bruce did not have a problem with the fact that Defendant saw Wirick on May 3, which showed a disagreement between Bruce and Hare, two of the Government's witnesses. Defendant asserts that this conflict, in and of itself, creates reasonable doubt on this issue as a matter of law.[11]

The jury heard evidence regarding Defendant's general manner of practice, including Defendant's failure to take adequate medical histories and conduct physical exams. The jury heard Defendant was aware that Wirick overdosed on methadone in January 2006, only two days after Defendant prescribed the methadone. Trial Tr.,

---

[11] Even if Bruce had no problem with Wirick seeing Defendant, Bruce testified Defendant inappropriately gave Wirick the specific quantity of medication on the May 3 visit. Trial Tr., 46, August 3, 2011.

33

128, August 16, 2011. Defendant also saw 80 patients the day he prescribed the methadone. Trial Tr., 46, August 9, 2011. The jury saw no evidence in Wirick's chart that Defendant cautioned Wirick about the methadone. The jury learned that after the overdose, Bruce spoke with Defendant regarding Bruce and Wirick's agreement that Bruce would be Wirick's only doctor. Despite Wirick's presence on Defendant's do-not-see list, Defendant prescribed Wirick full prescriptions for oxycodone, hydrocodone, and Soma on May 3.[12] Trial Tr., 136, August 16, 2011. The jury heard that Defendant did not check with Bruce's office before prescribing the medication on May 3. Id. at 131. Defendant testified he did not take Wirick's vital signs. Id. at 135. On May 3, Defendant saw 92 patients in 6.5 hours. Id. at 133. Even though Bruce testified Wirick had a legitimate need for pain management, Bruce also stated Defendant acted inappropriately in providing Wirick the quantity of drugs he gave him on May 3. Trial Tr., 45–46, August 3, 2011.

To be sure, the jury heard conflicting evidence as to whether Defendant prescribed to Wirick outside the usual course of medical practice and not for a legitimate medical purpose. But conflicting evidence does not per se create a

---

[12] Defendant states that Dr. Bradford Hare testified that an exclusive contract existed between Dr. Bruce and Defendant that prevented Defendant from prescribing Wirick medication. Trial Tr., 30, July 28, 2011. Hare testified "there was an exclusive contract with Dr. Bruce that Dr. MacKay was aware of for Dr. MacKay not to prescribe." Id. Regardless, Defendant correctly asserts that the agreement was an oral agreement between Bruce and Wirick that Wirick would receive medications solely from Bruce. Trial Tr., 20, 27–28, August 3, 2011.

reasonable doubt. Where the evidence conflicts, "we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." United States v. Chavez-Marquez, 66 F.3d 259, 262 (10th Cir. 1995). The above evidence, when examined in its entirety and in the light most favorable to the Government, is sufficient to show Defendant stepped outside of his role as a physician to Wirick and did not prescribe the medication for a legitimate medical purpose. Specifically, the jury heard evidence that Defendant did not check with Bruce's office on May 3 before writing the prescriptions and did not take Wirick's vital signs. Moreover, the jury heard Bruce's testimony that the quantity of drugs Defendant provided Wirick was inappropriate and more than necessary to treat Wirick's pain until Wirick could see Bruce. The jury could examine these facts and conclude Defendant engaged in criminal conduct. See Moore, 423 U.S. at 142–43 (concluding doctor acted as a "large-scale 'pusher' not as a physician" when he gave inadequate physical examinations, ignored the results of the tests he did make, took no precautions against a drug's misuse and diversion, did not regulate dosage, prescribing as much and as frequently as the patient demanded). Accordingly, we agree with the district court that the evidence was sufficient for the jury to conclude Defendant stepped outside of his role as a physician.

C.

Next, Defendant contends the Government presented no testimony or evidence that either medication, the oxycodone identified in count 1 and the hydrocodone

35

identified in count 2, alone was sufficient to cause Wirick's death. Rather, he says the Government's experts testified that Wirick died from the combined effect of the drugs. The Government asserts Defendant forfeited this argument on appeal by not raising it to the district court and failing to argue for plain error review in his opening brief. Defendant says his argument is not "new" on appeal. Instead, Defendant states his argument is simply a recitation of what the Government was required to prove in this case. In his reply brief, Defendant states he challenged the sufficiency of the evidence as to every disputed element of the offenses. Defendant contends each time he made his Rule 29 motion, he challenged the sufficiency of the evidence to prove the prescriptions charged in counts 1 and 2 were unlawfully issued, the medications prescribed caused Wirick's death, and Wirick's death was a reasonably foreseeable consequence of Defendant's issuance of the two prescriptions. Defendant posits that *implicit* in his argument on causation "was that the Government had failed to prove that the oxycodone or hydrocodone caused Wirick's death."

We therefore must examine Defendant's Rule 29 motion. We agree with the Government that, at trial, Defendant failed to present this specific argument in his oral motions for judgment of acquittal. Trial Tr., 195–96, August 9, 2011, Trial Tr., 161, August 16, 2011. After trial, however, Defendant filed a memorandum in support of his motion for acquittal on counts 1 and 2. Therein, Defendant argued the evidence was insufficient to establish beyond a reasonable doubt that Wirick died as

36

a result of Defendant's conduct and that Wirick's death was reasonably foreseeable. Specifically, Defendant asserted the theory that the drugs killed Wirick "was only one of four causes of death that was presented at trial." Defendant's argument appeared to be that four experts could not come to an agreement, therefore the jury could not have found beyond a reasonable doubt that the drugs caused Wirick's death. Within that argument, Defendant had one sentence relating to the issue he now raises on appeal: "Even Dr. Frikke . . . in her autopsy report admitted . . . that neither the hydrocodone or the oxycodone alone were at a concentration range that has been reported to cause death and that Mr. Wirick's pneumonia was a complication." Aplt. App'x 154. We will give Defendant the benefit of the doubt that he raised this issue in his Rule 29 motion.[13]

Because Defendant did not forfeit this argument, we turn to the merits of Defendant's second sufficiency claim. In his opening brief, Defendant asserts the jury had to reject Baden's expert testimony in its entirety in order to convict Defendant on counts 1 and 2. Defendant contends such a result is unreasonable. We disagree. When experts do not reach the same conclusion, the jury is responsible for making credibility determinations, not the court.[14]

---

[13] Even if Defendant had forfeited the issue and we reviewed for plain error, our plain error analysis in this context is essentially the same as our usual sufficiency of the evidence analysis. United States v. Gallant, 537 F.3d 1202, 1223 (10th Cir. 2008).

[14] Defendant appeared to understand this in the district court. In his proposed

(continued...)

We examine the record to determine whether the jury could conclude beyond a reasonable doubt that the oxycodone alone could have caused death and that the hydrocodone alone could have caused death. Dr. Frikke, the doctor who performed the autopsy, "certified that the death was due to drug toxicity poisoning with hydrocodone and oxycodone." Id. at 33. Dr. Grey, Utah's Chief Medical Examiner, however, testified "Wirick died as a result of combined effects of drug toxicities, specifically with oxycodone and diazepam as well as bronchopneumonia." Trial Tr., 29–30, August 2, 2011. Grey testified that he determines drug toxicity based primarily on the findings from toxicology. Id. at 39. In this case, the hydrocodone in Wirick's blood sample was 0.09 milligrams per liter. Id. According to Grey, a hydrocodone level of 0.09 "is a level that is above expected therapeutic and just below the lower limit of what is considered potentially toxic." Id. at 42. Likewise, the oxycodone in Wirick's blood sample was 0.09 milligrams per liter. Id. at 39. Again, the oxycodone is in the high therapeutic range. Id. at 43. Grey testified that "[t]oxic level would be adverse effects. Lethal level would be what is reported as something that pretty much guarantees you're going to die lethally." Id. Grey believed that none of the individual drug levels would kill a person and that no

[14](...continued)
jury instruction number 16, he requested that the jury be instructed as follows: "If you should decide that the opinion of an expert . . . is outweighed by other evidence, including that of other 'expert witnesses', you may disregard the opinion in part *or in its entirety*." Appellee's Supp. App'x, vol. I, 67 (emphasis added).

38

specific drug was present in Wirick's body at a level high enough to be considered lethal.  Id. at 44, 47.

In contrast, Dr. Hail, the only board certified toxicologist to testify, stated that hydrocodone and oxycodone were the drugs that resulted in Wirick's death.  Hail testified that although other drugs may have contributed to Wirick's death, the death would not have occurred absent the hydrocodone and the oxycodone.  Id. at 160–161.  Contradicting Grey's opinion, Hail testified "there is no such thing as a lethal drug level postmortem."  Id. at 162.  Hail provided the jury with an example.  If everyone in the courtroom overdosed on hydrocodone at that moment and she drew blood levels in everyone, everyone would be surprised how different the levels would be in one person to the next.  Id. at 162–163.  Hail said some drugs have meaningful levels in living patients, but not the drugs in this case.  Id. at 163.  She testified that if the levels of drugs are meaningless in living patients, they are even less meaningful in dead patients.  Id.  Moreover, Hail testified people are incorrect when they imagine a poster in the medical examiner's office with all of the drugs known to man and the lethal level of those drugs.  Id.  No such poster exists.  Id.  In contrast to Grey, Hail stated, "All I want to see is the presence of these drugs postmortem. I don't care what the level is."  Id.

On cross-examination, Defendant's counsel asked Hail about toxicity levels. Hail stated that although toxicity levels do not matter, the quantity of pills taken does matter.  Id. at 181.  She said Wirick's  high tolerance to opiates and opioids from his

39

heavy use would not equate to immunity. <u>Id.</u> Defendant's counsel asked Hail, "Any witness who talks about toxic levels is just plain wrong; is that your testimony?" <u>Id.</u> at 182. Hail said, "Correct, because they are not a toxicologist. They don't understand that." <u>Id.</u> Hail reached that conclusion because medical examiners "don't treat patients in the roles of the living, so I don't expect them to understand and have the same knowledge that I have about what these numbers mean." <u>Id.</u> Finally, Hail testified that the drug poisoning occurred before Wirick developed pneumonia. <u>Id.</u> at 168, 185.

Viewing this evidence in the light most favorable to the Government, a reasonable jury could conclude beyond a reasonable doubt that the oxycodone by itself and the hydrocodone by itself resulted in Wirick's death. Hail testified that the drug levels of the oxycodone and the hydrocodone are meaningless. This statement is further supported by Grey and Hail's testimony that blood samples taken from the heart, such as Wirick's blood sample, can vary from the actual blood toxicity level. This is because some drugs can have an effect called postmortem redistribution. Trial Tr., 41, August 2, 2011. Postmortem redistribution may cause drugs to become more concentrated or less concentrated in heart tissue after death. <u>Id.</u> For example, Grey testified that hydrocodone's range of levels between the heart and peripheral areas can vary from a ratio of "0.6 to four." <u>Id.</u> Moreover, the jury heard Wirick had taken a large amount of hydrocodone and oxycodone. Although Hail did not explicitly state the hydrocodone alone could have killed Wirick or the oxycodone

40

alone could have killed Wirick, the testimony Hail provided, viewed in the light most favorable to the Government, could allow the jury to reasonably infer that the oxycodone alone caused Wirick's death and that the hydrocodone alone caused Wirick's death. At a motion hearing on September 21, 2011, Defendant argued Hail's testimony was "completely irrational and completely ridiculous." Aplt. App'x 400. But the jury had every right to find Hail, a board certified toxicologist testifying that blood toxicity levels do not matter, more credible than Grey or Baden and to disregard any testimony it deemed not credible. Accordingly, we conclude no error, plain or otherwise, exists as to the sufficiency of the evidence on both counts 1 and 2.[15]

## D.

Next, Defendant contends the district court based its denial of his motion for judgment of acquittal on improper evidence. Specifically, Defendant posits the district court erroneously considered Dr. Frikke's autopsy report as evidence separate and apart from Dr. Grey's testimony. In its written opinion denying the motion for judgment of acquittal on counts 1 and 2, the district court noted the jury heard "testimony" from four different doctors as to Wirick's cause of death, including Dr.

---

[15] In a later subsection of his opening brief, Defendant re-argues the district court erred in denying his Rule 29 motion because reasonable doubt existed that Wirick's death resulted from the medications Defendant prescribed. For the precise reasons discussed in this section, however, we disagree with Defendant's re-argument.

41

Frikke, who was deceased, and Dr. Grey. The district court thus considered Frikke's autopsy report as "testimony" presented at trial. Defendant states he did not object to the Government offering Dr. Grey's expert testimony regarding Wirick's cause of death because he believed Grey's opinion and testimony were being offered in lieu of Frikke's, not in addition to the conclusions contained in the autopsy report.[16] Trial Tr., 32, August 2, 2011 ("Just for the record, I have no problem. I think it's a public record -- the actual report of the examination."). Defendant now argues the autopsy report's admission into evidence presents a Confrontation Clause issue.

The Government argues that because Defendant did not argue in his opening brief for plain error review, his claim is now waived. The Government also contends any alleged Confrontation Clause issue is waived because Defendant affirmatively stated he had no objection to the autopsy report and did not ask for a limiting instruction. In addition, Defendant cross-examined Grey and Hail about the autopsy report's contents and never objected to the Government's questions about the report.

In his reply brief, Defendant points to a Supreme Court decision issued prior to his trial in which the court held that forensic lab reports containing a testimonial certification of fact could not be introduced through the live testimony of another

---

[16] At a motion hearing after trial, but before the district court issued its opinion denying the Rule 29 motion on counts 1 and 2, the district court clearly stated "[Frikke] was one of the four expert witnesses on the issue." Aplt. App'x 402. Rather than counter the district court's statement, Defendant addressed the contents of the autopsy report.

analyst who did not actually perform the test or sign the certification. Bullcoming v. New Mexico, 131 S. Ct. 2705, 2713 (2011). Defendant argues that whether autopsy reports fell under Bullcoming did not become clear until the Eleventh Circuit's decision in Ignasiak, where the court held Bullcoming prohibited the admission of autopsy reports through a person other than the actual medical examiner who had performed the autopsy. Ignasiak, 667 F.3d at 1231. Defendant argues we should review this issue de novo because it presents a pure question of law premised on legal precedent that did not exist at the time of trial. Alternatively, he argues the autopsy report's admission satisfies the requirements of plain error because the report's admission was clearly erroneous, and as the only "opinion" testimony that supported the Government's theory on causation as to count 1 and 2, substantially prejudiced Defendant and resulted in manifest injustice.

We reject Defendant's argument that he is entitled to relief because of an intervening change in the law. Here, no change in the law occurred after Defendant's trial. The Supreme Court issued its opinion in Bullcoming in June 2011. Defendant's trial occurred in late July and early August, 2011. Defendant had the opportunity to object to the admission of the autopsy report on the basis of Bullcoming, as the defendant obviously did in Ignasiak. The district court then could have ruled on the issue.

Defendant also argues *in his reply brief* that the district court committed plain error in admitting the autopsy report. But the Government argues we cannot review

43

this forfeited claim because Defendant did not argue for plain error in his opening

brief. In this Circuit, "the failure to argue for plain error and its application on

appeal . . . surely marks the end of the road for an argument for reversal not first

presented to the district court." United States v. Lamirand, 669 F.3d 1091, 1100 n.7

(10th Cir. 2012) (citing Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127–28 (10th

Cir. 2011)). But at what point on appeal must an appellant argue for plain error and

its application? Fortunately we need not decide that issue today.[17] This is because,

even if we assume that error in fact occurred, Defendant cannot demonstrate that the

error affected his substantial rights. Cooper, 654 F.3d at 1117 (explaining the burden

is on the appellant to demonstrate an error, that is plain, affects his substantial rights,

---

[17] Because the Government forcefully asserts so many of Defendant's claims cannot be heard on appeal, we note that Lamirand and Richison do not appear to be inconsistent with our lengthy history of reviewing forfeited claims for plain error. United States v. Teague, 443 F.3d 1310, 1314 (10th Cir. 2006). Rather than creating a new procedural rule, these cases reenforced the principle that an appellant carries the heavy burden of satisfying plain error. United States v. LaHue, 261 F.3d 993, 1009 (10th Cir. 2001). And if an appellant fails to satisfy that burden, we do not develop a plain error argument for the appellant. United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir. 2012). This is entirely consistent with our case precedent and Federal Rule of Criminal Procedure 52(b), which allows us to consider a plain error even though it was not brought to the district court's attention. But is the adversely affected party heard and the adversarial process served when we allow a plain error argument for the first time in the reply brief? That the appellee has the opportunity to provide why the appellant's alleged error is not plain in its response brief may suffice. The appellant may then argue in his reply brief why the error is in fact plain. An appellant certainly would benefit from a more developed argument if he acknowledged forfeiture in his opening brief, but we do not discount the possibility that we may consider a plain error argument made for the first time in an appellant's reply brief.

and justice requires the error to be corrected). Without the admission of the autopsy report, the jury still had sufficient evidence to find Defendant guilty on both counts 1 and 2 because of Hail's testimony. Accordingly, under the plain error standard of review, the district court did not err in admitting the autopsy report.

E.

Defendant next contends the Government failed to prove Wirick's death was a "reasonably foreseeable" consequence of Defendant's prescribing the controlled substances. Defendant posits the lone fact that he knew Wirick overdosed on methadone in January 2006, only four months before his death, is not probative of whether Wirick's death was reasonably foreseeable. In addition, Defendant asserts the district court failed to fully and adequately instruct the jury on proximate cause and the definition of reasonable foreseeability, which confused the jury and left it to decide what might be adequate proof.

We note other circuits have concluded Congress intended 21 U.S.C. § 841(b)'s "resulting in death" language to "apply without regard to the principles of proximate cause or the foreseeability of death or serious bodily injury." United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001); see also United States v. Patterson, 38 F.3d 139, 145 (4th Cir. 1994) (holding reasonable foreseeability is not an element of § 841(b)); United States v. Robinson, 167 F.3d 824, 826 (3d Cir. 1999) (concluding § 841(b) does not require proof that a defendant's actions are the proximate cause of a victim's death.); United States v. Rebman, 226 F.3d 521, 522,

45

525 (6th Cir. 2000) (providing in dicta that the statute, on its face, "is, in effect, a strict liability statute with respect to the injury or death of another arising out of the distribution of drugs"), overruled on other grounds by United States v. Leachman, 309 F.3d 377, 385 n.9 (6th Cir. 2002); United States v. De La Cruz, 514 F.3d 121, 138 (1st Cir. 2008) (stating the Government does not need to prove foreseeability); United States v. Houston, 406 F.3d 1121, 1122–23 (9th Cir. 2005) (concluding the statute does not require the Government prove death was a foreseeable result); United States v. Webb, 655 F.3d 1238, 1254 (11th Cir. 2011) ("the plain and unambiguous language of [the statute] contains no foreseeability or proximate cause requirement"); cf. United States v. Hatfield, 591 F.3d 945, 950–51 (7th Cir. 2010) (expressing "some misgivings about interpreting 'results from' in the statute to impose strict liability," but not deciding the issue because the defendants did not challenge the interpretation of the statute as imposing strict liability on them for death or injury). Because the Government requested an instruction on reasonable foreseeability, however, it was required to prove it. Romero, 136 F.3d at 1273. And because of the posture of this case, we do not opine on whether § 841(b)'s language contains a foreseeability or proximate cause requirement. Rather, we first address whether the evidence presented at trial was sufficient to show Wirick's death was a "reasonably foreseeable" consequence of Defendant's prescribing the controlled substances before turning to the jury instruction on the standard for determining whether Wirick's death "resulted from" the medications Defendant prescribed.

46

1.

Defendant contends Wirick's previous methadone overdose was irrelevant to the question of whether Wirick's death four months later was reasonably foreseeable and says the Government presented no other evidence to support foreseeability. Defendant argues Wirick never misused his opioid medications during the seven years he treated Wirick. Defendant further asserts the methadone overdose was an anomalous event that did not involve hydrocodone or oxycodone. Defendant points to the differences between methadone on the one hand and hydrocodone and oxycodone on the other. Defendant also points out that Dr. Bruce prescribed Wirick opioids immediately following the January overdose. Defendant asserts that, by the Government's logic, every time Bruce prescribed to Wirick in the four months following the overdose, Bruce should have reasonably foreseen that Wirick would die from an overdose. Finally, Defendant argues his knowledge of the exclusive agreement between Bruce and Wirick does not prove foreseeability.

At trial, the Government asked Defendant whether he was aware Wirick would binge on his narcotics. Defendant stated he was not. But the jury saw notes from Bruce in Wirick's chart. Those notes indicate Wirick's wife stated that Wirick would take his medication in an inconsistent manner, often binging to the point of falling off a toilet. Trial Tr., 130, August 16, 2011. Defendant admitted that the notes were in his chart, but said he did not know Wirick would binge because he did not read Bruce's notes "word for word." Id. The jury heard testimony that Wirick

47

attempted to obtain an early refill from another doctor in Bruce's office, but that doctor refused. Defendant saw Wirick in May even though Wirick was on Defendant's do not see list. Defendant said he agreed to see Wirick because Bruce was out of town. Instead of prescribing a three-day prescription, the amount of time Bruce was to remain out of town, Defendant wrote Wirick a thirty-day prescription without contacting Bruce's office.[18] Id. at 131. Based on the information in Defendant's chart showing that Wirick binged on his medication, the fact that Wirick desired an early refill, and another doctor in Bruce's practice would not prescribe Wirick additional medication, the jury could reasonably conclude beyond a reasonable doubt that Wirick's death from Defendant's prescriptions was reasonably foreseeable.

2.

Defendant finds fault with two parts of the jury instructions. Defendant asserts the district court did not fully inform the jury of the law regarding proximate cause and argues the instruction caused confusion because the district court failed to define "reasonably foreseeable consequence."

Once again, the Government argues Defendant waived his challenge to the jury

---

[18] Although Defendant testified he had prescribed Wirick a 30-day supply, he now argues on appeal that he was mistaken because the DOPL report indicates that he prescribed Wirick a 10-day supply of oxycodone and a 15-day supply of hydrocodone. Aplt. App'x 12–13. Because Defendant testified as such, the jury could consider his statement. We have no power to change the record to suit Defendant's recollection, which is not what he testified to at trial.

instructions. Jury instruction 22 instructed the jury on counts 1 and 2. At a motion hearing on August 8, the district court requested the parties assist the court in crafting the instruction, "[n]either of you gave me much by way of defining to the jury what death resulting from the use of the drugs means. If you want to take your hand at that, I would really appreciate it." Appellee's Supp. App'x vol. I, 165. The court continued, "I was left with the feeling that the resulting from language should be perhaps defined a little more, a little better for the jury." Id. at 166. Four days later, the district court mentioned to the parties that it had provided them with a set of proposed instructions, including the two instructions for which it had asked for help. The district court continued to ask for assistance: "I really would appreciate some help on [instruction 22] as early as possible." Trial Tr., 83, August 12, 2011. After Defendant's attorney asked for clarification, the district court responded: "If you're happy with the one we have got, then I am too. I just hope you take another look at it from the eyes of a juror and ask does this make sense to me? If you're both happy with the language, the reasonably foreseeable standard, then I am." Id. at 84.

Defendant forfeited this issue. The district court, on multiple occasions, requested assistance in drafting the jury instruction at issue. Defendant's failure to object to the instruction, especially when invited by the district court to assist in the drafting the instruction, results in forfeiture of the issue. Defendant did not argue for the plain error standard in his opening brief or in his reply brief. Defendant has forfeited his challenge to the jury instructions and we will not craft a plain error

49

argument for him on appeal. United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir. 2012); see also United States v. McGlothin, 705 F.3d 1254, 1267 (10th Cir. 2013) (concluding appellant forfeited argument on appeal where appellant did not argue for the plain error standard in either of his briefs). Accordingly, we will not review Defendant's waived challenge to jury instruction 22.

## IV.

Defendant next challenges the testimony or Dr. Hail, arguing the district court erroneously permitted her to offer expert testimony. Pursuant to Federal Rule of Evidence 702, a district court must "assess proffered expert testimony to ensure it is both relevant and reliable." United States v. Avitia-Guillen, 680 F.3d 1253, 1256 (10th Cir. 2012) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)). The district court must "determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." Id. (internal quotation marks omitted). Once the expert is deemed sufficiently qualified, then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." Id. The district court "must adequately demonstrate by specific findings on the record that it has performed its duty as a gatekeeper" *when faced with a party's objection*. Id. Defendant correctly notes we usually review de novo whether the district court applied the proper standard in admitting expert testimony. Id. But where "a party fails entirely to object to expert testimony at or before trial, we review only for plain error." Id.

50

Defendant first challenges Hail's qualifications, asserting that Hail lacked expertise to meaningfully review all of the materials to make a cause of death determination because she is a toxicologist rather than a forensic pathologist. Second, Defendant challenges the methodology Hail used to reach her opinion. Defendant posits Hail's opinions cast serious doubt on whether she based them on a review of the autopsy report or on "subjective belief and unsupported speculation." Third, Defendant contends the district court improperly allowed Hail to give a legal opinion and testify to an ultimate issue: that Wirick's death resulted from the use of controlled substances.

Once again, the Government asserts Defendant waived this issue on appeal because Defendant did not object below and does not argue plain error on appeal. Additionally, the Government argues the Federal Rules of Evidence allow an expert to testify on an ultimate issue and, as a board certified toxicologist, Hail possessed the necessary training and experience to opine on the relationship between the drugs and Wirick's death. In his reply brief, rather than argue for plain error review, Defendant asserts his belief that de novo review applies because he "actually made these arguments on several occasions" and "challenged Dr. Hail's qualifications and methodology extensively on cross-examination and later in his Rule 29 Motion."

To determine whether Defendant objected to Hail's qualifications and methodology, we again turn to the record. On August 1, the day before the Government called Hail to testify, the parties gathered in the district court judge's

chambers to address objections. Defendant started out by arguing "it is my recollection that the government represented that [Hail] was not going to testify to the cause of death, but because she is going to be testifying to the cause of death, we believe it is cumulative . . . ." Aplt. App'x 344. Specifically, Defendant believed Hail's testimony would be cumulative to Dr. Grey's testimony. Id. at 346. Defendant argued Hail's testimony would be "almost verbatim the exact language that is contained in the autopsy report . . . that the combination of those two drugs was the cause of death." Id. Defendant also argued Hail's testimony would be cumulative to Dr. Hare's testimony regarding the composition of drugs and their interaction with one another. Id. at 350. At the hearing, the district court ruled that Hail's testimony would not be cumulative to either doctor. The district court reasoned that Hail would testify that the pneumonia did not contribute to the death, whereas Grey would testify that it did contribute. Hare did not offer an opinion as to how the drugs that Wirick took interacted in connection with his death. But, the district court stated it would be inclined to sustain an objection of cumulativeness if Hail simply parroted another expert. The district court advised Defendant: "So be ready for both of them." Id. at 352.

The next day at trial, Defendant first objected to the Government asking "Doctor, could you describe the purpose of opioids?" Trial Tr., 151, August 2, 2011. Defendant believed the question would lead to testimony cumulative to Hare's testimony. Next, Defendant objected to Hail's partial answer to the question of

52

"What's a benzo?" Defendant objected to the narrative, stating Hail had moved on to other areas. Id. at 153. The Government proceeded to ask Hail what a "synergistic" effect was. Defendant objected, stating that the jury had heard about this topic from Grey earlier in the day. Id. Once Hail began talking about blood taken from the heart, Defendant objected to testimony regarding "heart blood" because it would be the third time it was discussed. Id. at 164. Defendant next objected to a question asking Hail if she knew how many pills Wirick consumed between May 3 and May 6. When Hail responded she did not memorize how many were missing, Defendant stated the question called for speculation unless she had a foundation that she was with Wirick when he took the pills. Id. at 167. Finally, on cross examination, Defendant asked Hail whether she had any formal training in pathology. Id. at 170. Hail stated she did not. Defendant also asked whether she examined the slides that went along with the autopsy report. Id. at 174. She stated she had not because she read the autopsy report.

We must note two important instances where Defendant did not object. First, the Government offered Hail as an expert in emergency medicine and toxicology. Trial Tr., 145, August 2, 2011. Defendant did not object. The district court stated, "Okay. Proceed with your next question. I usually don't do anything to qualify experts." Id. Second, the Government asked Hail, "Based upon your review of all this information that you gathered concerning David Wirick's death, did you form an opinion that his drug use resulted in death?" Id. at 160. Hail answered "yes."

53

Id. The Government then asked "What is your opinion." Id. Defendant, again, did not object.

In support of his argument that he objected, Defendant also points to his memorandum in support of his motion for judgment of acquittal in which he cited Hail's testimony that she did not review the microscopic slides of Wirick's lungs or heart tissue and that she would not know what she was looking at in the slides because she is not a pathologist. Aplt. App'x 150. Defendant also cited her testimony that the combination of one oxycodone, one hydrocodone and one Valium could cause death and that she disagreed that pneumonia was a contributing factor in Wirick's death because people seek out medical attention when they have pneumonia. Id. A close examination of Defendant's argument in his Rule 29 motion shows, however, that he did not challenge the district court's gatekeeping function. In discussing why he believed the evidence to be insufficient, Defendant referenced the "expert" opinion of Hail, arguing this "other" expert weakened Frikke's opinion about the cause of death. Id. at 155. Lastly, Defendant brings our attention to the post-trial motion hearing on Defendant's motion for judgment of acquittal on counts 1 and 2. At that hearing, Defendant argued Hail's testimony was the only testimony that could lead anybody to believe that Wirick's blood toxicity level was outside of a therapeutic level. Defendant asserted:

> Dr. Hail's explanation is completely irrational and completely ridiculous, because what she really said was one pill, the combination of Oxycodone, Hydrocodone and Valium . . . one pill would kill you.

54

> She said even more. She said I didn't care about the therapeutic levels, because her opinion was that [] kills you. That therapeutic dosage of that one pill and those three medications kills you. . . . She is completely contradicted by the evidence. . . . Moreover, Dr. Hail . . . was the only one that said . . . the wonderfully interesting expert opinion that the reason why he didn't die from pneumonia is because people who have pneumonia only die in hospitals.

Aplt. App'x 400–01.

Our detailed record review reveals that Defendant never challenged Hail's qualifications or methodology. At trial, Defendant objected to what he believed to be cumulative testimony, a narrative answer, and an answer based on speculation. But notably absent during the Government's direct examination of Hail is an objection to the district court qualifying Hail as an expert or her qualifications or methodology. During cross examination, Defendant questioned Hail's qualifications and questioned her methodology, but never suggested the jury could not consider her testimony to be that of an expert. Questioning an expert about her methodology and qualifications on cross examination is not the same as objecting to her being qualified as an expert. Defendant did not make a belated objection to Hail's qualifications as an expert during his cross examination. Juries often hear dueling expert testimony, and in this case, the jury chose to credit Hail's testimony.

After trial, in both his memorandum and at the motion hearing, Defendant questioned Hail's methodology and qualification to give expert testimony because she was not a pathologist. But Defendant did not challenge the district court's decision to allow Hail to give expert testimony. Rather he argued a pathologist,

55

instead of a toxicologist, would be the appropriate person to provide testimony as to cause of death and that no reasonable jury could accept Hail's testimony. This argument does not go to Hail's fitness to testify as an expert, but to the sufficiency of the evidence to convict Defendant on Counts 1 and 2.

Rather than alternatively argue for plain error in his reply brief, Defendant asserts he objected on the basis of cumulativeness and that "resulting in death" and "cause of death" were the same. Based on our record review, we agree with Defendant that he objected based on cumulativeness and asserted that the "resulting in death" and "cause of death" terminology represented a "distinction without a difference," but Defendant did not object to Hail's testimony for the reasons he articulates on appeal. Our case law routinely reviews these forfeited claims for plain error. Avitia-Guillen, 680 F.3d at 1256. But we also know that we do not craft plain error arguments for appellants on appeal. DeChristopher, 695 F.3d at 1091. We easily identify the quagmire: What is the extent of an appellant's burden to demonstrate plain error? Need he only provide us the facts on which we could find plain error or does he need to provide us an argument incorporating the correct legal standard? These are certainly interesting questions, but this case is not the proper vehicle to decide the issue. For in this case, the district court's decision to qualify Hail as an expert and allow the jury to consider her testimony does not rise to plain error.

Furthermore, because Defendant did not object to Hail's methodology or

56

qualifications, the district court was not required to make explicit findings. Avitia-Guillen, 680 F.3d at 1260. "So we are left to look only for some obvious error in the court's implicit finding that [Hail's] methods were reliable" and Hail was qualified to testify as an expert. Id. The district court heard Hail testify she is board certified in toxicology, a lecturer to residents, medical students, and pharmacologists doing a rotation in medical toxicology, and an author of articles in textbooks. Trial Tr., 141–42, August 2, 2011. Hail testified toxicology is the study of poisons and that as a toxicologist, she treats overdoses and directs other doctors on how to manage overdoses. Id. at 137, 139–40. Hail admitted she was not a pathologist, which is why she did not review the autopsy slides. Instead, she offered an opinion on the drugs in Wirick's system. Nothing in the record indicated Hail lacked the necessary training and experience to provide testimony on the relationship between drugs or poisons and Wirick's death.[19] The district court did not plainly err in its implicit determination that Hail's testimony was based on "reliable principles and methods" that were "reliably applied." Fed. R. Evid. 702(c), (d).

To the extent Defendant challenges the district court's reliance on Hail's expert testimony in ruling on his Rule 29 motion, we disagree with Defendant's

---

[19] Defendant contends that even if Hail had been properly qualified to opine as to Wirick's cause of death, the district court should have nonetheless excluded her testimony as cumulative to Grey's. This argument, of course, is incorrect. As noted by Defendant, only Hail completely excluded pneumonia as a factor in Wirick's death.

position.  The district court allowed, with no objection, Hail to testify as an expert on toxicology.  The jury could reasonably rely on her testimony as a board certified toxicologist.  Defendant had the opportunity to question Hail and to present his own expert to the jury.  Defendant also had the opportunity to counter Hail's testimony that a toxic level does not exist through other experts.  The jury heard the evidence and made a rational decision based on the testimony presented at trial.

Defendant also argues the district court improperly allowed Hail to give a legal opinion and testify to an ultimate issue, specifically, that Wirick's death resulted from or, in other words, Wirick's cause of death was because of, controlled substances.  Again, because Defendant did not object to Hail's use of the phrase "cause of death" or "death resulted from" at trial, we review his claim for plain error.[20]  United States v. Schneider, 704 F.3d 1287, 1293 (10th Cir. 2013).  Federal Rule of Evidence 704(a) allows "an expert to opine on an 'ultimate issue' to be decided by the trier of fact."  Schneider, 704 F.3d at 1293 (testifying doctor opined that the defendant had engaged in health care fraud resulting in death).  That expert, however, must explain the basis for her opinion and not "simply tell the jury what result it should reach."  Id.  In this case, Hail did not tell the jury Defendant was

[20] Defendant did not object because Hail was going to testify as to an ultimate issue.  The objection was based on the cumulativeness of the testimony to that of Dr. Grey and the autopsy report.  Not only did Defendant fail to object to this line of questioning, Defendant asked questions using the phrase "cause of death" on Hail's cross examination.  Trial Tr., 180, August 2, 2011 ("Valium in Mr. Wirick's system is significant, is it not, when you are talking about the cause of death?").

58

guilty. Instead, she explained her observation based on the evidence in the case. Accordingly, we find no error at all in the district court's admission of Hail's testimony regarding Wirick's cause of death.

V.

Defendant next asserts the district court committed prejudicial error in admitting Government Exhibit 133, a compilation of charts showing the annual rankings of Utah's top ten issuers of hydrocodone and oxycodone prescriptions from 2005 through 2009. The charts reveal Defendant wrote the largest number of hydrocodone prescriptions in Utah from 2005 through 2008. In 2009, Defendant ranked third. Defendant was the seventh highest issuer of oxycodone prescriptions in 2005, fourth in 2006, 2007, and 2009, and second in 2008. Defendant contends this information was not relevant and any probative value was substantially outweighed by its unfairly prejudicial impact and risk of confusing and misleading the jury. Defendant asks for a new trial based on the admission of this exhibit.

At trial, the district court engaged in a lengthy discussion with counsel regarding the exhibit. The Government essentially argued Defendant "opened the door" to the admission of Exhibit 133 by raising the subject in his opening statement when he asserted he practiced in a small town—"his community"—and he did not want people suffering from chronic pain to have to travel to Logan, Ogden, or Salt Lake City. Trial Tr., 47, July 20, 2011. The Government desired to respond to this argument by pointing out Defendant was the number one provider in the entire state.

59

Trial Tr., 102, July 21, 2011. The district court understood and acknowledged the potential Rule 403 problem: "The unfair prejudice would come from the jury jumping to the conclusion . . . if he is the biggest provider of this drug in the state . . . then he must be guilty. . . . he must be bad." Id. at 104. The district court further told the Government: "You're accusing him because he is the number one provider of hydrocodone in the state, that he must be prescribing it not for legitimate medical purposes." Id. at 105. The court pressed the Government: "Do you agree that the reason or the main aspect of the evidence that you want to come in is his ranking? . . . Is that the most important aspect of it?" Id. at 106–07. The Government responded, "I think so. It is the volume compared to the rest of the state." Id. at 107. After hearing from the parties, the district court said the Government's best argument was that Exhibit 133 should be admitted in response to Defendant's opening statement depicting Defendant as a one-doctor practice who did not want "folks" in his community to travel to receive treatment for chronic pain. Id. at 109. Ultimately, the district court allowed the testimony for the reasons articulated by the Government and explicitly stated that the probative value was not substantially outweighed by the danger of unfair prejudice. Id. at 114.

A district court may generally admit relevant evidence. Fed. R. Evid. 402. Rule 403, however, allows a district court to exclude relevant evidence if its probative value "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

60

wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "In determining whether evidence is properly admitted under Rule 403, we consider (1) whether the evidence was relevant, (2) whether it had the potential to unfairly prejudice the defendant, and (3) whether its probative value was substantially outweighed by the danger of unfair prejudice." United States v. Cerno, 529 F.3d 926, 933 (10th Cir. 2008). Our abuse of discretion review "affords the district court considerable discretion in performing the Rule 403 balancing test" because "district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." Id. at 935–36 (internal quotation marks omitted).

We first address relevance. The district court ruled the exhibit was relevant because, if admitted, the exhibit would have an impact on the trial. We agree the exhibit was relevant. The Government charged Defendant with unlawful distribution of hydrocodone and oxycodone. The Government had to prove Defendant stepped outside his role as a doctor and became a criminal drug pusher. The charts certainly painted a picture of Defendant's practice as a pain management physician. Moreover, "a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." United States v. Chavez, 229 F.3d 946, 952 (10th Cir. 2000). Defendant explained why his practice shifted to pain management in his opening statement—he did not want to see members of his community travel to other parts of the state to receive treatment for pain. Exhibit 133 is relevant in light of this statement.

61

We acknowledge the possibility that the admission of the exhibit unfairly prejudiced Defendant. "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Leonard, 439 F.3d 648, 652 (10th Cir. 2006) (internal quotation marks omitted). As mentioned above, the district court expressed concern that admission of Exhibit 133 could lead the jury to base its decision of guilt or innocence not on whether Defendant unlawfully prescribed to each of the indictment patients, but instead on Defendant's ranking as the number one physician prescribing hydrocodone in Utah.

By allowing the jury to hear testimony regarding Exhibit 133, the district court created a risk that the jury's decision would be improperly affected by the fact that Defendant prescribed so many opioid prescriptions. The district court acknowledged the possibility that the jury could be confused by the admission of the chart and believe that because Defendant was the number one provider of hydrocodone in Utah, he must be prescribing hydrocodone not for a legitimate medical purpose to the indictment patients. Although the exhibit was undoubtedly prejudicial, that alone "does not necessarily get the defendant over his evidentiary hurdle." Cerno, 529 F.3d at 935.

Finally, we consider whether the district court abused its discretion in concluding that the probative value of the exhibit was not substantially outweighed

by the risk of unfair prejudice. "Under Rule 403's balancing test, it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value." Id. at 935. In balancing, we "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Id.

Defendant directs us to United States v. Jones, 570 F.2d 765 (8th Cir. 1978). In Jones, the defendant physician appealed a conviction for distributing a Schedule II controlled substance without a legitimate medical purpose and outside the usual course of professional practice. The Government indicted Defendant on two counts only. The jury convicted Jones of one count, but acquitted him on the other. To buttress its case against Jones, the Government introduced 478 prescriptions issued to patients over a 20-month time period. The Eighth Circuit concluded the evidence was relevant, but should have been excluded under Rule 403. Id. at 768. The court stated:

> [T]he Government sought to imply wrongdoing on the physician's part from the quantity of the prescriptions . . . . The evidence lacked substantial probative force upon the issue of improper medical practice in the transactions charged, yet it could have led the jury to speculate that the quantity of prescriptions alone established wrongful conduct by Dr. Jones.

Id. at 769.

The Government distinguishes Jones by arguing the evidence in this case relates to Defendant's ranking in connection with drugs that were charged in the

63

indictment and the exhibit did not include information for years outside of the charged crimes. The Government cites two out of circuit cases. In United States v. Merrill, 513 F.3d 1293, 1303 (11th Cir. 2008), the Eleventh Circuit said, "A jury may consider prescription data sets outside those specifically charged in the indictment to determine whether a physician has exceeded the legitimate bounds of medical practice and as evidence of a plan, design, or scheme." (internal quotation marks omitted). Similarly, in United States v. Harrison, 651 F.2d 353, 355 (5th Cir. 1981), the Fifth Circuit held that the jury was not limited to considering only charged prescriptions in considering whether the defendant exceeded the legitimate bounds of medical practice. The court concluded "[p]rescriptions issued at other times were admissible as evidence of plan, design or scheme." Id.

The cases cited by the Government are inapplicable in this case. The Fifth Circuit's conclusion in Harrison that the other prescriptions were admissible was not based on Rule 403 balancing. Rather, it appears to be based on Rule 404(b), which prohibits evidence of other acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Rules, however, allow evidence of other acts for another purpose, such as proving "plan." Fed. R. Evid. 404(b)(2). In this case, Defendant did not object based on Rule 404(b) and likewise did not raise the issue on appeal.

Merrill, however, did involve an objection based on Rule 403. But the Government's quote from Merrill involved analysis regarding Rule 404(b). As to

64

Rule 403, the court pointed out that in addition to charging the defendant physician in <u>Merrill</u> with unlawful prescribing, the Government also charged the defendant with devising a scheme to defraud Medicaid and other insurance providers. <u>Merrill</u>, 513 F.3d at 1301. And, as part of that scheme, the Government alleged the defendant prescribed excessive and inappropriate quantities and combinations of controlled substances to patients outside the usual course of professional practice. In its Rule 403 balancing analysis, the court stated that the summary of other prescriptions was relevant to prove the defendant prescribed excessive and inappropriate quantities and combinations of controlled substances and that in doing so he acted outside the usual course of professional practice. The court noted the *only* way the Government could prove this part of the scheme was to present evidence on the quantities themselves and then comparing those quantities to the relevant norm. The court also stated the summary was relevant because it raised an inference of excessiveness and impropriety and because the number of drugs being prescribed to each patient and the combination of drugs being prescribed to each patient raised an inference of inappropriate and excessive conduct. Because, in this case, the Government did not have to prove a scheme to defraud involving excessive amounts of drugs, <u>Merrill</u> is inapposite.

Likewise, this case is not analogous to <u>Jones</u>, but for reasons other than those the Government listed in its brief. Unlike the defendant in <u>Jones</u>, Defendant "opened the door" to the admission of Exhibit 133. We stress that this is a close question, but

65

we do not decide it in the first instance. Under the applicable standard of review, we ask only whether the district court abused its discretion. Although we agree with the reasoning of the Eighth Circuit and believe that, under the Eighth Circuit's facts, the probative value of an exhibit like Exhibit 133 would have been substantially outweighed by the danger of unfair prejudice, we believe the district court did not abuse its discretion in admitting Exhibit 133 under the facts of this case.[21] Obviously, Defendant's opening the door makes the exhibit no less prejudicial and capable of misleading the jury. But the opening of the door in the opening statement makes Exhibit 133 more probative. Defendant made his statement about why his practice shifted from orthopedic surgery to pain management in his opening statement. During the exchange with the judge regarding admission of Exhibit 133, Defendant characterized his opening statement in the following manner:

---

[21] Even if the district court had erred in admitting Exhibit 133, the error was harmless. We render judgment "after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; see also Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). A district court's "decision whether to admit or exclude evidence, is considered harmless unless a substantial right of a party is affected." United States v. Charley, 189 F.3d 1251, 1270 (10th Cir. 1999) (internal quotation marks and brackets omitted). "An error affects the substantial rights of a party if it had a substantial influence on the outcome or which leaves one in grave doubt, as to whether it had such effect." United States v. Espinoza, 244 F.3d 1234, 1240 (10th Cir. 2001) (internal quotation marks and brackets omitted). In conducting this analysis, we review the record as a whole. Id. at 1241. After examining the totality of the record, our above discussion concludes the jury had sufficient evidence to convict Defendant on each count without considering Exhibit 133.

"[W]hat I said was Dr. MacKay[,] because of the community that he was in, and the fact that he didn't want folks to go far away, and he had these chronic pain patients that he thought it was appropriate to continue to treat them. That is what I said. It may very well be that if you treat that geographic basis in Box Elder County, you may very well be number one. I don't think anyone really knows that. . . . Who knows what it means. I really think that that is exactly where we're going to be that he is number one, therefore, he is guilty."

Trial Tr., 110–11, July 21, 2011. Even with Defendant's "clarification" of his opening statement, Defendant placed in issue his role as a doctor to the community of Box Elder County. Because of the additional probative value of the exhibit from Defendant's opening statement, we cannot hold the district court abused its discretion in conducting its Rule 403 analysis.

## VI.

Defendant next asserts his 20-year sentence violates the Eighth Amendment's guarantee not to be subject to excessive sanctions because the harshness of the penalty outweighs the gravity of the offense. Defendant's reasoning, however, is best described as a Fifth Amendment due process argument. Defendant contends the Controlled Substances Act provides for "radically different penalties" for identical conduct, dependent only on the schedule of the unlawfully prescribed drug. This is because both hydrocodone and oxycodone in their "pure forms" are Schedule II drugs, but hydrocodone "mixtures," such as Lortab (hydrocodone and acetaminophen), are Schedule III drugs. No similar provision exists for oxycodone mixtures. In application, Defendant's conviction on count 1, for the oxycodone

67

mixture, a Schedule II drug, mandates a mandatory minimum sentence of 20 years. 21 U.S.C. § 841(b)(1)(C). But Defendant's conviction on count 2, for the hydrocodone mixture, a Schedule III drug, carries no mandatory minimum sentence, but instead has a maximum sentence of 15 years. 21 U.S.C. § 841(b)(1)(E)(i). Defendant argues the disparate scheduling between hydrocodone mixtures and oxycodone mixtures is arbitrary and creates nonsensical sentencing disparities. Defendant argues the Controlled Substances Act's legislative history and the relative case law do not reveal any rational explanation as to why a physician convicted of unlawfully prescribing an oxycodone mixture has committed a substantially more egregious crime than a physician convicted of unlawfully prescribing a hydrocodone mixture.

Unsurprisingly, the Government argues waiver. First, the Government asserts Defendant's Eighth Amendment argument is inadequately briefed, and we should not consider it. Second, the Government notes, to the extent Defendant contends a Fifth Amendment due process violation occurred, the argument on appeal is different from his due process argument to the district court. Because the argument is allegedly different, and because Defendant does not argue for plain error on appeal, the Government argues we should not consider the matter.

The Government correctly states Defendant did not raise either the Eighth Amendment issue or the Fifth Amendment issue in his Rule 29 motion. Two days before sentencing, Defendant filed a document entitled "position of party with

68

respect to sentencing factors." Appellee's Supp. App'x Vol. I, 109. Defendant raised, for the first time, four reasons why 21 U.S.C. § 841 is unconstitutional as applied. Id. at 114. One argument asserted § 841(b)(1)(C)'s mandatory minimum sentence violates the Eighth Amendment because the 20 year sentence is disproportionate to the crime committed. Another of those arguments was that the statute violates the Fifth Amendment by making an arbitrary and irrational distinction between oxycodone and hydrocodone. Id. at 116. Defendant argued hydrocodone and oxycodone are substantially similar drugs, used for the same purposes, and cause similar effects. Id.

At the sentencing hearing, the district court pointed out to Defendant that he had not previously argued the disparity between the hydrocodone and oxycodone made the Controlled Substance Act unconstitutional as applied to him. Defendant's counsel responded, "[t]hat's true, Your Honor." Id. at 210. The district court stated Defendant's argument "renews a request that [the district court] grant [Defendant's] motion for a judgment of acquittal on Counts 1 and 2." Id. The court said that it had previously ruled on the motion, without having the benefit of seeing Defendant's new arguments. Defendant responded he did not have a reason "to advance further legal argument with respect to . . . the rationality that Congress drew between hydrocodone and oxycodone with respect to the disparity of the sentences that are required with respect to Count 2 as opposed to the minimum mandatory of Count 1." Id. at 210–11. Defendant stated he did not want to advance new arguments until the

69

district court ruled on the Rule 29 motion. The district court then expressed concern that Defendant began his sentencing argument acknowledging the district court has no discretion under the statute, but "later [Defendant will] say [the district court] rejected [his new] arguments, and then [Defendant will] raise that up with the Court of Appeals as if [the district court] had time to address them." Id. at 211. Perceptive. Despite this reservation, the district court allowed Defendant to address the new arguments. Defendant's counsel then stated,

> "I was going to attempt to address them, but I really do think that we are in a position where the minimum mandatory right now is the point of the realm in light of the Court's ruling. And I think that that is really a sentence that very few people in this courtroom think is proportionate when you consider the nature of the situation we have here and the realities of [Defendant] as a human being. . . . And the question of the Eighth Amendment is proportionality. . . . We believe that a 20-year sentence in this case is essentially a death sentence for [Defendant], could not possibly be proportionate given all the circumstances and facts of this particular criminal case. . . . Moreover, as the Court well knows, the other argument was that if [Defendant] had not prescribed Percocet for Mr. Wirick, then the Court would be put in the position where there would be no application of the minimum mandatory. And the maximum under Lortab or hydrocodone is up to 15 years. There is no rational distinction that I think medically you can make, politically you could make, societally you could make between Lortab and Percocet when it comes to prescribing. That's irrational use of legislative power, which we suggest is a violation of equal protection . . . .

Id. at 212, 214–15, 217.

The district court never ruled explicitly on the new arguments. The district court referenced the statute, then stated, "I have no discretion here. The sentence is 20 years imprisonment . . . . Congress has imposed this law, not me." Id. at 262.

70

Although Defendant does not explicitly argue in his opening brief that a due process violation occurred, he does renew both his Fifth Amendment and Eighth Amendment argument under the same heading. And after reviewing the record, the Government's argument that Defendant waived the argument on appeal is patently incorrect. As to the Fifth Amendment, to the district court, Defendant argued the Controlled Substances Act was unconstitutional as applied because he prescribed Lortab, a Schedule III substance, and Percocet, a Schedule II substance. Defendant argued those drugs are essentially the same, yet have irrationally different penalties. On appeal, Defendant refined his argument to specify that hydrocodone *mixtures* are Schedule III substances and oxycodone *mixtures* are Schedule II substances. Although Defendant improved his terminology on appeal, Defendant's *as applied* challenge to the statute has not changed. As to the Eighth Amendment, Defendant argues his sentence violates that amendment's guarantee not to be subject to excessive sanctions because the harshness of the penalty outweighs the gravity of the offense.

The actual waiver question before us is whether Defendant waived his Eighth Amendment and Fifth Amendment arguments when he stated, "I was going to attempt to address them, but I really do think that we are in a position where the minimum mandatory right now is the point of the realm in light of the Court's ruling." In light of the district court's decision not to rule on the new arguments, perhaps the district court thought Defendant conceded the argument. But out of an

abundance of caution, we will first review Defendant's Eighth Amendment issue before addressing Defendant's Fifth Amendment issue.

## A.

In this Circuit, "[i]n general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." United States v. Delacruz-Soto, 414 F.3d 1158, 1168 (10th Cir. 2005). Here, Defendant's sentence of 20 years was at the statutory minimum. Moreover, Defendant's sentence was *below* the advisory Guideline range of 292–365 months—"a range that defines the national norm for sentencing for this particular crime." Id. In this case, the Government prosecuted Defendant for stepping out of his role as a doctor, becoming a criminal drug dealer, and prescribing a controlled substance that resulted in Wirick's death. The sentence on count 1 "does not resemble the sentences of disproportionate severity that courts have struck down as cruel and unusual in the past." Id. (citing Weems v. United States, 217 U.S. 349, 358, 364, 381 (1910) (discussing sentence of 15 years at hard labor for falsifying a government form)). Accordingly, we conclude Defendant's sentence was not excessive and does not violate the Eighth Amendment's prohibition on cruel and unusual punishment.

## B.

Having determined the district court did not impose a sentence in violation of the Eighth Amendment, we now turn to whether it imposed a sentence in violation of the Fifth Amendment's Due Process Clause. When Congress enacted the

72

Controlled Substances Act, it established five schedules of controlled substances. Congress empowered the Attorney General to move a substance from one schedule to another schedule and to add or remove substances from the schedules. 21 U.S.C. § 811(a). The Attorney General must follow specified procedures when adding a substance to a schedule.

> First, the Attorney General must request a scientific and medical evaluation from the Secretary of Health and Human Services (HHS), together with a recommendation as to whether the substance should be controlled. A substance cannot be scheduled if the Secretary recommends against it. § 201(b), 21 U.S.C. § 811(b). Second, the Attorney General must consider eight factors with respect to the substance, including its potential for abuse, scientific evidence of its pharmacological effect, its psychic or physiological dependence liability, and whether the substance is an immediate precursor of a substance already controlled. § 201(c), 21 U.S.C. § 811(c). Third, the Attorney General must comply with the notice-and-hearing provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, which permit comment by interested parties. § 201(a), 21 U.S.C. § 811(a). In addition, the Act permits any aggrieved person to challenge the scheduling of a substance by the Attorney General in a court of appeals. § 507, 21 U.S.C. § 877.

Touby v. United States, 500 U.S. 160, 162–63 (1991). We normally will not set aside a legislative classification "if any state of facts rationally justifying it is demonstrated to or perceived by the courts." United States v. Szycher, 585 F.2d 443, 445 (10th Cir. 1978). And the Controlled Substances Act directly affects the health and safety of American citizens. The record before us on this issue is thin. Rather than explain how the Attorney General made an irrational decision in scheduling the drugs, Defendant simply states "[t]he CSA's legislative history and the relevant case

73

law do not reveal any rational explanation for which a physician convicted of unlawfully prescribing Percocet has committed a sufficiently more egregious crime than a physician convicted of unlawfully prescribing Lortab, to justify a *mandatory* 20-year prison sentence." (internal footnote omitted). We simply cannot say the Attorney General acted irrationally on this record.

## VII.

Finally, for the first time on appeal, Defendant alleges the district court committed error when it sentenced him to a general 240-month sentence of imprisonment, rather than specifying individual sentences for each offense. Nine of Defendant's counts of conviction have a maximum statutory term of imprisonment below the 240 month statutory minimum term of imprisonment for count 1. Defendant believes his sentence is illegal because the district court may have imposed a sentence on counts 2, 4–7, 15–17, and 108 that exceeds the statutory maximum. Ordinarily, we review a challenge to the legality of a sentence de novo. United States v. Jones, 235 F.3d 1231, 1235 (10th Cir. 2000). But because Defendant raises this issue for the first time on appeal, we review for plain error.

Defendant's sentence was governed by 2011 United States Sentencing Guideline § 5G1.2(b), which states that "the sentence imposed on each other count shall be the total punishment." Section 5G1.2(c) provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except

74

to the extent otherwise required by law." So, what happens where the total punishment exceeds the statutory maximum on some counts of conviction? The application notes provide guidance:

> Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence.

U.S. Sentencing Guideline Manuel § 5G1.2 cmt. n.1 (2011). The 240-month total sentence is problematic only for counts 2, 4–7, 15–17, and 108. But did the district court plainly err by failing to impose a sentence on each count? A district court imposes an illegal sentence when it sentences a defendant to a term of incarceration that exceeds the statutory maximum. United States v. Gonzalez-Huerta, 403 F.3d 727, 739 n.10 (10th Cir. 2005). Such an illegal sentence triggers "per se, reversible, plain error." Id. In this case, the district court announced at sentencing that Defendant would serve a term of imprisonment of 240 months, a total sentence below the advisory guideline range, but yet exceeded the statutory maximum sentence on nine counts. We could easily assume from the Guidelines that the district court sentenced Defendant to 240 months on counts 1, 8–14, 18–26, 32–35, 41–42, 81–84, 120–121, and 123–124; that he sentenced Defendant to 180 months on count 2; 120 months on counts 4–7 and 108; and 48 months on counts 15–17. And we could further assume that the sentences were imposed to run concurrently.

75

But the judgment is unclear whether the district court intended to impose a 240-month sentence on each count, a clearly illegal sentence.[22] See e.g. United States v. Ward, 626 F.3d 179, 184 (3d Cir. 2010); United States v. Cummings, 395 F.3d 392, 400 (7th Cir. 2005); United States v. Woodard, 938 F.2d 1255, 1257 (11th Cir. 1991). Accordingly, a limited remand is necessary to allow the district court to clarify the sentence for the record.

AFFIRMED IN PART and REMANDED for resentencing.

---

[22] The district court stated the sentence it imposed, the statutory minimum on count 1, was "too long," but "Congress has imposed this law, not me." Appellee's Supp. App'x, vol. 1, 262. The court obviously varied downward in imposing a sentence of 240 months, but did not articulate its reasoning. After a sentencing judge considers all of the factors listed in 18 U.S.C. § 3553(a) and makes an individualized assessment based on the facts presented, the judge "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." Gall v. United States, 552 U.S. 38, 50 (2007). Accordingly, at re-sentencing, the court needs to explain why the sentence it imposes is sufficient, but not greater than necessary to satisfy the sentencing objectives.